IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> ART INTELLECT, INC., a Utah corporation d/b/a MASON HILL and VIRTUALMG, PATRICK MERRILL BRODY, and LAURA A. ROSER, and GREGORY D. WOOD, <br><br> Defendants. | **CIVIL CONTEMPT ORDER** <br> **AND** <br> **MEMORANDUM DECISION** <br><br><br> Case No. 2:11-CV-357-TC |

## INTRODUCTION

This matter comes before the court on Plaintiff Securities and Exchange Commission's (SEC) motion seeking a court ruling that Defendants Patrick Brody and Laura Roser are in contempt of court for violation of this court's orders.[1]  For the reasons set forth below, the court finds that both Mr. Brody and Ms. Roser are in CONTEMPT of court for violating the April 18, 2011 Order Appointing Receiver, Freezing Assets and Other Relief ("Asset Freeze Order")[2] but that the SEC has not met its burden to prove violation of the April 18, 2011 Temporary Restraining Order ("TRO").[3]

---

[1]Docket No. 23.

[2]Docket No.5.

[3]Docket No. 4.

## FINDINGS OF FACT[4]

### The TRO and Asset Freeze Order

In this civil enforcement action, Plaintiff SEC contends that Defendants Art Intellect (d/b/a Mason Hill and VirtualMG) ("Mason Hill"), Patrick Brody, and Laura Roser have violated the federal securities laws by acting as unregistered brokers or dealers while fraudulently selling unregistered "investment contract" securities beginning as early as April 2009.  As part of the enforcement proceedings, the SEC sought and obtained, in April 2011, a temporary restraining order and an asset freeze order.  (See Apr. 18, 2011 Temporary Restraining Order (Docket No. 4) ("TRO"); Apr. 18, 2011 Order Appointing Receiver, Freezing Assets and Other Relief ("Asset Freeze Order") (Docket No.5) (collectively "April 2011 Orders")).

The TRO restrained Patrick Brody and Laura Roser (collectively "Defendants") from violating federal securities laws pending final resolution on the merits:

> Pending the determination of the Commission's Motion for a Preliminary Injunction or hearing on the merits, Defendants and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, are temporarily restrained and enjoined from **engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation** of Sections 5(a), 5(c) and 17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act and Rule 10b-5 thereunder.

(TRO at 2-3 (emphases added).)

The Asset Freeze Order froze the assets of Mr. Brody, Ms. Roser, and Mason Hill, and

---

[4]The facts are taken from the evidence submitted by parties in declarations (see Appendix to Docket No. 3, and Docket Nos. 12, 24, 64, 70), and during the June 29, 2011, and July 12, 2011, evidentiary hearings (see Hr'g Transcripts (Docket Nos. 75, 88)).

appointed a receiver to manage and recover Mason Hill assets.  By the Asset Freeze Order, the

court took "exclusive jurisdiction and possession of **the assets, of whatever kind and wherever**

**situated, of** the following Defendants: Art Intellect, Inc., d/b/a Mason Hill and VirtualMG,

**Patrick Merrill Brody, Laura A. Roser**, and Gregory D. Wood . . . ."[5]  The asset freeze

extended to "Receivership Property," which is broadly defined to include

> all property interests of the Receivership Defendants [including Mr. Brody and
> Ms. Roser], including, but not limited to, monies, funds, securities, credits,
> effects, goods, chattels, lands, premises, leases, claims, rights and other assets,
> together with all rents, profits, dividends, interest or other income attributable
> thereto, of whatever kind, which the Receivership Defendants [including Mr.
> Brody and Ms. Roser] own, possess, have a beneficial interest in, or control
> directly or indirectly.

(Asset Freeze Order ¶ 8.A.).  The scope of the asset freeze was described as follows:

> 3.      Except as otherwise specified herein, all Receivership Assets are
> frozen until further order of this Court. Accordingly, all persons and entities with
> direct or indirect control over any Receivership Assets, other than the Receiver, are
> hereby restrained and enjoined from **directly or indirectly transferring, setting off,**
> **receiving, changing, selling, pledging, assigning, liquidating or otherwise**
> **disposing of or withdrawing such assets**.

> 4.      Defendants Patrick M. Brody, Laura A. Roser and Gregory D. Wood,
> their agents, servants, employees, attorneys, and those persons in active concert or
> participation with them who receive actual notice of such Order by personal service,
> facsimile service, or otherwise, and each of them, **hold and retain within their**
> **control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance,**
> **assignment, dissipation, concealment, or other disposal of any assets, funds, or**
> **other properties . . . of Defendants Patrick Merrill Brody, Laura A. Roser and**
> **Gregory D. Wood currently held by them or under their control . . . .**

(Id. ¶¶ 3-4 (emphasis added).)

In addition to a freeze of assets, the court, in the "Access to Information" portion of the

---

[5]Asset Freeze Order ¶ 1 (emphasis added).

Asset Freeze Order, ordered Mr. Brody and Ms. Roser "to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property."[6] Furthermore, the Asset Freeze Order enjoins acts interfering, hindering, or otherwise obstructing the Receiver's ability to perform his duties (such as to marshal and manage Receivership Property), and acts that dissipate or diminish the value of Receivership Property.[7]

**Attempt to Evade Service**

On April 18, 2011, Mr. Brody and Ms. Roser (who are husband and wife) received actual notice of the enforcement action and the SEC's attempt to serve them with the relevant papers, but they attempted to evade service for some time.[8] According to the testimony of Gregory Wood, a Co-Defendant in the lawsuit and former President of Mason Hill:

> A    [After the lawsuit was filed, I went to Mr. Brody's and Ms. Roser's] home that evening that [the company] was shut down. They attacked me for shutting the company down and stealing money from the company. That's all they had to say.
>
> . . .
>
> Q    Did they talk about whether or not they were going to accept service of process with you?
>
> A    I didn't discuss that - - excuse me. **I told the constable that they were**

---

[6]Id. ¶ 9; see also id. ¶¶ 10-11(A)-(H).

[7]Id. ¶ 30.

[8]See Docket Nos. 11-12.

> **home because I'd just left there.  I said, you need to go there right now**
>
> **because they are home.  But I do remember saying I got served, so you**
>
> **guys should probably be served any minute.**
>
> Q     Were they surprised that they had been sued by the SEC?
>
> A     **They were catty.  They laughed about it.  They kind of said, oh, no big**
>
> **deal**. . . .

(July Tr. at 176-77 (emphasis added).)

That same day, April 18, 2011, a constable was prepared to serve the complaint and

summons, the SEC's TRO motion, the TRO, and the Asset Freeze Order on Mr. Brody, Ms.

Roser, and Mason Hill.  He went to the Defendants' home twice that day, once in the afternoon

and once in the evening.  There was no answer at the door and the lights were not on, but two

cars, one of which was registered in Mr. Brody's name, were parked in the driveway.

On August 19, 2011, the constable spoke to Gregory Wood, whom he had previously

served.  According to the constable, "[Gregory] Wood told me that he spoke with Roser and

asked her why she was hiding.  She told him that she did not want to deal with it and was not

going to make it easy."[9]  Over the next three days, the constable attempted to serve the

Defendants at their home twelve more times, at different times of the day and evening.

On April 25, 2011, the court granted the SEC's Motion for Service by Publication and

Alternative Means and extended the TRO until a preliminary injunction hearing could be held.[10]

_____

[9]Declaration of Orson Madsen (Docket No. 12-1) ¶ 6.

[10]See Docket Nos. 13-14, 31.

The SEC published notice of its action against Mr. Brody, Ms. Roser and Mason Hill in the Salt

Lake Tribune and Deseret News and also sent copies of the TRO, Asset Freeze Order, Complaint

and other pleadings to all known email addresses of Mr. Brody and Ms. Roser.

Finally, in addition to service by published legal notice and electronic mail, Mr. Brody

and Ms. Roser were personally served with the Complaint and other pleadings and April 2011

Orders on April 25, 2011.[11]  Despite Defendants' unsupported protestations to the contrary, Mr.

Brody and Ms. Roser had notice of the TRO and Asset Freeze Order no later than April 25,

2011.[12]

**Actions Contrary to the Mandates of the TRO and Asset Freeze Order**

On May 13, 2011, before the preliminary injunction hearing was held, the SEC filed a

Motion for Order to Show Cause Why Defendants Patrick M. Brody and Laura A. Roser Should

Not Be Held in Civil Contempt for violating the TRO and the Asset Freeze Order.[13]  The SEC

alleged in that motion that the Defendants were disposing of assets subject to the Asset Freeze

Order and continuing to offer unregistered securities in a fraudulent offer mirroring the scheme

alleged in the SEC's current enforcement action.

**Sale and Disappearance of Assets Subject to the Asset Freeze Order**

As noted above, the language of the Asset Freeze Order enjoined Mr. Brody and Ms.

---

[11]See Summons Returned Executed (Docket Nos. 15-16) on Mr. Brody and Ms. Roser.

[12]In their opposition to the motion for a finding of contempt, the Defendants insist that the SEC has not proven that they had actual notice of the April 2011 Orders until May 16, 2011. (See Defs.' Mem. Opp'n (Docket No. 78) at 2-3.)  But they provide no documentation or sworn testimony to support that unconvincing assertion.

[13]Docket No. 23.

Roser from "transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing" Receivership Property.[14]  Nevertheless, in May 2011, the Receiver learned that furniture and computers, among other items, belonging to Mr. Brody and Ms. Roser were being advertised and offered for sale.

Mr. Brody and Ms. Roser, who are married, have a personal residence at 6492 Canyon Crest Drive in Salt Lake County ("Canyon Crest home").  They live there with Bryan Brody, the 18-year-old son of Mr. Brody.[15]  The Canyon Crest home is owned by Ms. Roser.[16]

From April 27, 2011, to May 5, 2011, a series of classified advertisements were posted on the website www.ksl.com by a seller named "Bryan" with the phone number 801-558-3073.[17] One of these advertisements, dated April 28, 2011, lists for sale the "Entire Contents of a Home." The advertisement states, in part, "We are moving and need to sell everything is [sic] our home. Offer anything for anything."[18]  The advertisement contains several photographs of the items offered for sale.  The total asking price of the items in this advertisement was $51,000.[19]  The photographs were taken in the Canyon Crest home and depict personal items belonging to the

---

[14]Asset Freeze Order ¶ 3.

[15]See Declaration of Stacie Parker (Docket No. 24-1) ¶ 3.  Although Mr. Brody is currently serving a sentence in a Federal Bureau of Prisons facility, the Canyon Crest home is his personal address.

[16]See Declaration of Scott R. Frost (Docket No. 24-2) at ¶ 8 and Ex. B, attached thereto.

[17]Parker Decl. at ¶¶ 6, 8 and Ex. A, attached thereto; Frost Decl. at ¶¶ 5-7 and Ex. A, attached thereto.

[18]Ex. A to Frost Decl.

[19]Frost Decl. ¶ 6 and Ex. A attached thereto.

Defendants.[20]  The telephone number of the seller is Bryan Brody's cell phone number.[21]

Additional advertisements listed by the same seller, "Bryan" at 801-558-3073, were posted from April 27, 2011, through May 5, 2011, and contained photographs of a number of household and other items, including a motorcycle, Macintosh computers, a computer printer, an iPhone, an iPad, furniture, and appliances, for sale at various prices.  The asking price for these items totaled $9,060.[22]  All of the items shown in these advertisements belong to the Defendants and were photographed in the Canyon Crest home.[23]

Two other advertisements, posted May 1, 2011, from the same seller, "Bryan" at 801-558-3073, list a "$1,000,000 Home in Amazing Neighborhood."[24]  The home offered is the Canyon Crest home owned by Ms. Roser.[25]  One of the advertisements shows an interior photograph of the Canyon Crest home, and offers the top two floors of the house for rent of $3,000.  The other advertisement shows a view from the Canyon Crest home and offers the home for sale for $925,000 (the "Description" notes that "Price is 125k below last appraisal").[26]  This advertisement states that seller financing is available with a $100,000 down-payment and no

---

[20]Parker Decl. ¶¶ 2-4, 6-8.

[21]Id. at ¶ 6.

[22]Frost Decl. ¶¶ 5-7 and Ex. A attached thereto.

[23]Parker Decl. ¶¶ 2-4, 6, 8, and Ex. A attached thereto.

[24]Id. Ex. A.

[25]See id. ¶ 8; Frost Decl. ¶¶ 3-4, 8.

[26]Id.

credit check required.[27]

A majority or all of the assets being offered for sale in the KSL advertisements were likely acquired with funds fraudulently obtained from Mason Hill investors.[28] For instance, Stacie Parker, who was Mr. Brody's personal assistant beginning in May 2010 (she worked out of the Canyon Crest home), testified that:

> Mr. Brody and Ms. Roser had several credit cards in their names and/or in the name of Art Intellect or VirtualMG . . . . Mr. Brody and Ms. Roser allowed me to use their credit cards for their personal expenses and shopping for the household. The credit card I primarily used for their shopping and expenses was in the name of Laura Roser and Art Intellect. . . . I was instructed by Mr. Brody to deliver all of Mr. Brody and Ms. Roser's bills to Michael Keith, the Chief Operating Officer for Mason Hill.[29]

Her testimony went unchallenged by the Defendants.

Michael Keith (whose testimony was also unchallenged) testified that "as functioning [Chief Operating Officer] of Mason Hill, my responsibilities included overseeing the accounting and banking functions of the company. This included recording accounting transactions and managing various bank accounts **consistent with instructions from Mr. Brody** [regarding what to do with money received from investors] and the needs of the company."[30] According to Mr. Keith,

---

[27]See Parker Decl. at ¶ 8 and Ex. A, attached thereto; Frost Decl. at ¶¶ 5-7 and Ex. A, attached thereto.

[28]The court, in a recent Preliminary Injunction Order, held that the SEC had proven, by a preponderance of evidence, that Mr. Brody and Ms. Roser violated federal securities laws through Mason Hill's fraudulent solicitation of unregistered securities. (See Oct. 20, 2011 Prelim. Inj. Order (Docket No. 134).)

[29]Parker Decl. ¶ 5.

[30]Decl. of Michael Keith (Ex. E to Docket No. 64) ¶¶ 3-4 (emphasis added).

> [a] large portion of the money deposited with Mason Hill by investors was used to
> pay the personal expenses of Pat Brody and Laura Roser. . . . I would estimate that
> Mason Hill paid between $28,000 and $35,000 per month to cover Mr. Brody and
> Ms. Roser's personal spending.  Part of the monthly amounts paid Mr. Brody and
> Ms. Roser's credit card bills – some as high as an accumulated $75,000; tithing to
> the LDS Church; automobile payments – including $700 per month for a car used
> by Mr. Brody's attorney; home mortgages; and personal travel-related expenses.[31]

And Scott Frost, a staff accountant for the SEC who investigated matters related to this

case, testified that former employees, including Stacie Parker and Michael Keith, told him that

Mr. Brody and Ms. Roser

> had several credit cards in their names and/or Art Intellect or Virtual MG, entities
> owned by Roser.  Credit cards were used by some of the former employees to buy
> personal goods for Brody, Roser and their household.  The former employees
> informed me that Mason Hill paid all of these credit card bills using investor
> funds.[32]

He further testified that Mr. Brody's and Ms. Roser's bills included an $8,000 hot tub, and that

such bills were given to Michael Keith to pay out of the Mason Hill operating account (which

was funded by Mason Hill investors).[33]

On May 17, 2011 hearing, the court held a status conference on pending injunction and

contempt matters, during which it was agreed that the Receiver would conduct an inventory of

the Defendants' private residence and that the Defendants would withdraw the advertisements on

www.ksl.com.  According to the Receiver, "the Canyon Crest home previously contained a

number of valuable and expensive items, in addition to those that had been listed for sale.  These

items were seen in the home after April 15, 2011 and included: a grand piano, antique typewriter,

---

[31]Id. ¶ 6.

[32]Frost Decl. ¶ 14.

[33]Id. ¶¶ 11, 15.

almost new hot tub, rare books, jewelry, and a restored Porsche automobile."[34]

During the court-ordered inventory of the Canyon Crest home, it became clear that

several items were missing, including a grand piano, antique typewriter, hot tub, rare books,

jewelry, and a restored Porsche automobile.  According to the Receiver,

> [n]one of these items were found in the Canyon Crest home during the inventory.
> During the inventory I also noted: there were indentation marks in the carpet that
> indicated to me a grand piano had previously been there and had been recently
> removed; there was a large back patio that contained a large empty area with
> wiring sticking out from the wall, indicating to me the hot tub had recently been
> removed; there were empty hooks on some of the walls, indicating to me that
> artwork had recently been removed from those areas.  I also noted that at least
> some of the items listed for sale in the ads were not in the Canyon Crest home,
> although I understand the items were photographed in the home.  Those items
> included Mac computers, an iPhone, and an iPad.[35]

Currently, neither the SEC nor the Receiver knows the location of those items because

Mr. Brody and Ms. Roser have refused to cooperate.[36]  Despite repeated requests from the SEC

and the Receiver, they have not complied with the disclosure requirements of the Asset Freeze

---

[34]Declaration of Wayne R. Klein (Receiver) (Ex. F to Docket No.64) ¶ 7.

[35]Klein Decl. ¶ 8.  See also May 20, 2011 Declaration of Scott Frost (Ex. G to Docket No. 64) ¶¶ 3-9 (describing similar observations he made while taking part in the inventory of the Canyon Crest home).

[36]In the July 8, 2011 Memorandum In Opposition To Motion For Finding Contempt (Docket No. 78), the Defendants contend that they "cooperated with the SEC including granting access to Ms. Roser's home for the Receiver's inventory."  (Id. at 3.)  Discussing the "Assets identified by the SEC and Receiver as having been owned or possessed by Defendants prior to May 16, 201" (when they purportedly received notice of the Asset Freeze Order), the Defendants claim that the assets "were not owned by Defendants, or remain on the household premises and have not been sold, transferred or conveyed, or cannot be adequately identified by the Receiver's or the Commission's description, or are subject to the privileges of the Fifth Amendment to the United States Constitution or other applicable exemption of assets under Utah law or privilege." (Id. at 3-4.)  The Defendants' conclusory statements are not supported by any citation to law, documentation or sworn testimony.

Order.[37]

Although the Defendants, upon admonition from the court during a May 17, 2011 hearing,[38] withdrew their advertisements on www.ksl.com, and allowed representatives of the SEC and the Receiver to inventory the contents of the Canyon Crest home, the damage had already been done and has not been rectified since.   Initially, Mr. Brody and Ms. Roser refused to appear for properly noticed depositions.  Months later, they agreed to appear for depositions. On June 23, 2011, the SEC took Mr. Brody's and Ms. Roser's depositions.[39]  During the depositions, SEC counsel asked several questions regarding assets that belong to the Receivership Estate and which the Receiver was not able to locate during his inventory at the Brody-Roser home.  Mr. Brody and Ms. Roser, in response, asserted their Fifth Amendment right against self-incrimination to every question concerning assets, including whether he or she recognized the assets, whether the assets were contained in the home and whether any of the items had been sold.[40]

**Continuation of Similar Enterprise**

The SEC contends that both Mr. Brody and Ms. Roser, despite receiving notice and proper service of the TRO, continue to violate the federal securities laws by recruiting sales people and soliciting investor funds in a scheme almost identical in nature to Mason Hill.  The

---

[37]See id. ¶ 9.  See also id. Ex. A (email listing missing items and requesting information and return of those items from Mr. Brody and Ms. Roser).

[38]See May 17, 2011 Minute Entry / Docket Order (Docket No. 31).

[39]See Dep. of Patrick M. Brody (Pl.'s Ex. 2 from July 12, 2011 Hr'g); Dep. of Laura Roser (Pl.'s Ex. 3 from July 12, 2011 Hr'g).

[40]See, e.g., Brody Dep. at 17-21; Roser Dep. at 22, 35, 38-39, 43-45, 55-57.

court, in the TRO, found that the SEC made a sufficient and proper showing in support of

restraining Mr. Brody and Ms. Roser from engaging in ongoing violations of the federal

securities laws

> by evidence establishing a prima facie case of and a strong likelihood that the
> Commission will prevail at trial on the merits and that the Defendants, directly or
> indirectly, have engaged in and, unless restrained and enjoined by order of this
> Court, will continue to engage in acts practices, and courses of business
> constituting violations of Sections 5(a), 5(c), and 17(a) [of the Securities Act] and
> Sections 10(b) and 15(a) of the Exchange Act . . . and Rule 10b-5 thereunder
> . . . .[41]

The court also recently made a similar finding when it issued its October 20, 2011 Preliminary

Injunction Order.[42]

     The SEC presented evidence about post-TRO activities by Mr. Brody, and, to a lesser

extent, Ms. Roser.  That evidence takes the form of two unchallenged declarations, one by Scott

Frost, SEC's staff accountant and investigator on the case, and one by Mr. Ryan Reilly, an

individual whom Mr. Brody attempted to recruit as a sales associate for Mason Hill and, after

Mason Hill was shut down, a different heretofore unknown entity called Residential Realty

Advocates (RRA).

     According to Mr. Reilly, who had posted his resume on Linkedin.com in early April

2011, received a call during the week beginning April 18, 2011

> from a gentleman who identified himself as Mr. Brody.  Mr. Brody told me he
> was calling about a position with a company by the name of Mason Hill.  He told
> me about the company and gave me the website address of www.masonhill.com.
> He wanted me to work for him as a sales associate helping to recruit investors in
> Mason Hill.  Mr. Brody told me that for each investor I brought into Mason Hill, I

---

[41]TRO at 2.

[42]See Docket No. 134.

would receive a commission of $1,500.  I spoke with Mr. Brody twice during the
week, but I ultimately decided not to work for Mason Hill.[43]

Mr. Reilly received the call during the week that the SEC and the Receiver shut down Mason

Hill and received the TRO from the court.

On Tuesday, April 26, 2011, one day after Mr. Brody was personally served with the

TRO, Mr. Reilly

received a call from a gentleman who identified himself as Patrick Merrill.
Patrick Merrill told me about a sales opportunity with an entity by the name of
Residential Realty Advocates ("RRA").  I was informed that the company was
located in the Salt Lake City area however there were additional locations in
Nevada and Florida.  Patrick Merrill told me that he was interested in hiring me as
a sales associate with RRA.  He told me that RRA would pay me $1,500 for each
new investor I secured for RRA.  I told Patrick Merrill that I needed to do some
research before deciding to join RRA.  He told me that he would call me back the
next day, April 27.  The structure of the opportunity presented by Patrick Merrill
sounded very similar to the Mason Hill program.[44]

On that same day, "Patrick Merrill" sent an email to Mr. Reilly that contained two attachments

that "Patrick Merrill" called "investment overview"[45] and "financials."[46]

Mr. Reilly did some research on the Internet and found that Patrick Merrill Brody has

recently been sued by the SEC.  Mr. Reilly observed that "The SEC action that named Mr. Brody

looked similar to what he was trying to do with RRA, so I decided not to pursue the opportunity.

Based on Mr. Reilly's testimony in his declaration, the court is convinced that "Patrick Merrill"

---

[43]Declaration of Ryan Reilly (Ex. 3 to Docket No. 24) ¶¶ 2-4.

[44]Id. ¶¶ 5-6.

[45]The document is titled "Foreclosure Litigation Investment Opportunity."  Id. at Ex. A,
attached thereto.

[46]The document is titled "Financial Breakdown (Example Property)."  Id.

14

and Patrick Brody are one and the same person.  Mr. Reilly said that,

> [o]ver the course of two week's time, I spoke with both Mr. Brody and Patrick
> Merrill on multiple occasions.  They had the same voice inflections, pitch, sound and
> speech mannerisms and I concluded that they were the same person.  I confronted
> Patrick Merrill with my conclusion when we spoke on April 28, 2011, and he denied
> that his full name was Patrick Merrill Brody or that he had anything to do with Mason
> Hill.  He did tell me, however, that he didn't think I would be a good fit for
> RRA.[47]

That was the extent of Mr. Reilly's conversations with Mr. Brody.

Scott Frost, the SEC investigator, also stated in his sworn declaration that on May 6,

2011, he heard Mr. Brody testify under oath about Ms. Roser's involvement with a business

called "Jensen Blair."  Mr. Frost was referring to Mr. Brody's testimony during Mr. Brody's

sentencing proceedings in the federal criminal case of United States v. Brody, Case No. 2:08-CR-

410 (D. Utah).[48]  According to Mr. Frost,

> On May 6, 2011, I attended a sentencing hearing in which [Patrick] Brody was
> sentenced for a misdemeanor tax conviction before Judge Clark Waddoups in the
> U.S. District Court, District of Utah.  During the course of the hearing, Brody was
> called to testify.  Among other things, he said: his wife, [Laura] Roser, had
> previously planned to travel to Ireland for the purpose of establishing a business; that
> he, Brody, had used an email address by the name
> www.patrickmerrill@jensenblair.com; and that Jensen Blair was the name of the
> business that he and his wife had considered starting in Ireland.[49]

---

[47]Reilly Decl. ¶¶ 8-9.

[48]On October 22, 2010, a jury convicted Mr. Brody of failure to file a tax return, in
violation of 26 U.S.C. § 7203.  See Indictment pp. 9-10 in United States v. Brody, Case No.
2:08-CR-410 (D. Utah) (hereinafter "U.S. v. Brody");  Jury Verdict (Docket No. 223) in U.S. v.
Brody.  Mr. Brody, who is currently serving a ten-month federal sentence (he self-surrendered on
July 1, 2011) faces approximately six more months in prison.  See May 6, 2011 Minute Entry
(Docket No. 302) in U.S. v. Brody.

[49]Frost Decl. ¶ 13.

During Mr. Brody's deposition in this case, when SEC counsel asked Mr. Brody whether he attempted to establish a business venture in Ireland, Mr. Brody's response was, "I take the Fifth."[50]  When SEC counsel asked if Mr. Brody was "familiar with the term Jensen Blair," he once more exercised his Fifth Amendment rights.[51]

Similarly, during Ms. Roser's deposition, when SEC counsel asked, "You tried to start up a separate business in Ireland, didn't you, Ms. Roser?", she responded "I assert my rights to take the Fifth Amendment."[52]  She provided the same answer when asked "What is RRA?" and "Are there any questions you will answer regarding RRA . . .?"[53]

## CONCLUSIONS OF LAW

The court finds that the SEC has established by clear and convincing evidence that Patrick Brody and Laura Roser are in contempt of court for violating the Asset Freeze Order, but the SEC has not met its heavy burden to show that either Mr. Brody or Ms. Roser is in contempt of court for violating the TRO.

### Contempt Standard

Under federal law, the court has inherent power to coerce compliance with its orders, sanction behavior constituting fraud on the court, and vindicate its authority in the face of contumacious behavior.  See, e.g., Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991) ("It is firmly established that the power to punish for contempt is inherent in all courts.  This power

---

[50]Brody Dep. at 57.

[51]Id.

[52]Deposition of Laura Roser (Pl.'s Ex. 3) at 40-41.

[53]Id. at 81.

16

reaches both conduct before the court and that beyond the court's confines, for the underlying

concern that gave rise to the contempt power was not merely the disruption of court proceedings.

Rather, it was disobedience to the orders of the Judiciary, regardless of whether such

disobedience interfered with the conduct of trial.") (internal citations, omissions, and quotation

marks omitted).  "[C]ontempt is considered civil if the sanction imposed is designed primarily to

coerce the contemnor into complying with the court's demands and criminal if its purpose is to

punish the contemnor, vindicate the court's authority, or deter future misconduct."  United States

v. Lippitt, 180 F.3d 873, 876-77 (7th Cir. 1999) (citing Hicks v. Feiock, 485 U.S. 624, 631-32

(1988)).  See also United States v. Buck, 281 F.3d 1336, 1342 (10th Cir. 2002) (noting that fraud

on the court "requires a showing that one has acted with an intent to deceive or defraud the

court" through a "deliberate scheme").

     To succeed on its motion for a finding of contempt, the SEC must prove, by clear and

convincing evidence, that (1) each order at issue was valid and enjoined conduct in reasonable

detail (i.e., was sufficiently specific when defining the conduct enjoined); (2) the enjoined party

had actual knowledge of the order through personal service or otherwise and was subject to it;

and (3) the enjoined party disobeyed the order.  See, e.g., Reliance Ins. Co., 159 F.3d at 1315-16;

Fed. R. Civ. P. 65(d)(2) (defining persons bound by injunction and restraining order).

     In civil contempt proceedings, disobedience of the order need not be willful.  Rather, "[a]

district court is justified in adjudging a person to be in civil contempt for failure to be reasonably

diligent and energetic in attempting to accomplish what was ordered."  Bad Ass Coffee Co. of

Hawaii, Inc. v. Bad Ass Ltd. P'ship, 95 F. Supp. 2d 1252, 1256 (citing Goluba v. School Dist. of

Ripon, 45 F.3d 1035, 1037 (7th Cir. 1995)).[54]

**The SEC Has Satisfied Its Burden.**

      **Valid and Sufficiently Detailed Orders Existed.**

The orders at issue here are the TRO and Asset Freeze Order. They are valid.

The court also holds that each order was sufficiently clear in defining what conduct was prohibited. Here, there can be no genuine doubt about what the orders prohibited. In addition to the clear language of the orders, the court held multiple hearings before issuing them. In sum, the first element of contempt, the existence of valid court orders, has been established.

      **Mr. Brody and Ms. Roser Each Had Appropriate Notice of the Orders.**

An injunction is binding on those "'who receive actual notice of the order by personal service or otherwise.'" Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1317 (10th Cir. 1998) (quoting Fed. R. Civ. P. 65(d)). The SEC went to great lengths to serve Mr. Brody and Ms. Roser with the relevant papers. Mr. Brody and Ms. Roser were abundantly aware of the relevant court orders and the contents of those orders no later than April 25, 2011.

      **The SEC Has Partially Established Mr. Brody's and Ms. Roser's Contumacious Behavior and Disobedience**

            The Asset Freeze Order

The court finds that the SEC has presented clear and convincing evidence that Patrick

---

[54]A person facing an order to show cause "may assert a defense to civil contempt by showing by clear and convincing evidence that 'all reasonable steps' were taken in good faith to ensure compliance with the court order and that there was substantial compliance, or relatedly by proving 'plainly and unmistakenly' defendants were unable to comply with the court order." Id. n.8. But no evidence has been presented by the Defendants that would enable them to rely on such a defense.

Brody and Laura Roser each knowingly violated — and continue to violate — the Asset Freeze Order.

Evidence shows that the Defendants attempted to sell (and in some cases have sold) assets subject to the Asset Freeze Order and belonging to the Receivership Estate.  This violation of the Asset Freeze Order was in addition to Mr. Brody's and Ms. Roser's failure to comply with disclosure requirements in that Order.  All of the evidence shows Mr. Brody's and Ms. Roser's complete lack of regard for the court's rulings.

First, the court notes that it draws an adverse inference from Mr. Brody's and Ms. Roser's invocation of their Fifth Amendment Privilege.  Both Defendants refused to answer any substantive questions about assets during their depositions.  The United States Supreme Court has held that, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).  "'Failure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question.'" Id. at 319 (quoting United States v. Hale, 422 U.S. 171, 176 (1975)).  Mr. Brody and Ms. Roser's silence and failure to contest the SEC's assertions is evidence that they sold (or at a minimum, continue to hide) assets that are subject to the Asset Freeze Order.

Second, the evidence shows a blatant unwillingness on the part of the Defendants' to cooperate in any meaningful way with the SEC and the Receiver.  Mr. Brody and Ms. Roser not only refused to cooperate but they actively obstructed the SEC's and the Receiver's ability to

carry out a valid court order (an order issued to protect defrauded investors).[55]

    The TRO

    The evidence is not clear and convincing that Patrick Brody or Laura Roser violated the

TRO.  The SEC has a high burden to meet.  The language of the TRO enjoins the Defendants

from "engaging in transactions, acts, practices, and courses of business described herein, and

from engaging in conduct of similar purport and object in violation of Sections 5(a), 5(c) and

17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act and Rule 10b-5

thereunder."[56]  But the TRO does not specifically describe "transactions, acts, practices, and

courses of business."  The closest it comes is to refer to the contents of the SEC's Memorandum

in Support of the Ex Parte Motion for Temporary Restraining Order and Other Relief, the

exhibits filed therewith, and supporting declarations and documentation[.]"[57] The focus of the

suit and the activities the SEC sought to restrain were violations of the Securities Act and the

Exchange Act.

    The evidence shows that Mr. Brody attempted to engage in fraudulent activities by

continuing in the same pattern challenged by the SEC in the case here.  But the most SEC has

shown is that Mr. Brody attempted to recruit a sales associate to conduct a business similar to

---

[55]Any assertion on the Defendants' behalf that the Asset Freeze Order was not fair or valid because the court has yet to fully adjudicate the claims on the merits is simply incorrect. The same can be said for their expressed concern about what they consider an "overly aggressive" receiver.  The actions of the Receiver do not go beyond the scope of the Receiver's rights and obligations under the court's Asset Freeze Order.  The Defendants' dissatisfaction with the court's finding is not a valid reason to refuse to comply.

[56]TRO at 2-3.

[57]Id. at 1-2.

Mason Hill and that he had possession of documents spelling out an investment offer that had

some of the same aspects as the Mason Hill business plan.  But there is no evidence of

solicitation of potential investors, much less that money was actually received from any investor.

The entirety of the direct evidence against Ms. Roser was Mr. Frost's summation of

Patrick Brody's testimony during Mr. Brody's May 6, 2011 criminal sentencing hearing.[58]

According to Mr. Frost:

> On May 6, 2011, I attended a sentencing hearing in which [Patrick] Brody was
> sentenced for a misdemeanor tax conviction before Judge Clark Waddoups in the
> U.S. District Court, District of Utah.  During the course of the hearing, Brody was
> called to testify.  Among other things, he said: his wife, [Laura] Roser, had
> previously planned to travel to Ireland for the purpose of establishing a business; that
> he, Brody, had used an email address by the name
> www.patrickmerrill@jensenblair.com; and that Jensen Blair was the name of the
> business that he and his wife had considered starting in Ireland.[59]

Everything Mr. Brody said on the witness stand related to activities that took place in the past

(e.g., "previously planned" and "considered starting").  At the most, the evidence shows that Ms.

Roser was involved in Jensen Blair before the TRO was issued.  There is no direct evidence that

Ms. Roser acted in any way concerning the business of Jensen Blair after the TRO was issued.

Moreover, the SEC has not established that Jensen Blair was operating at the relevant times or

that it was operating in a manner similar to Mason Hill.  Accordingly, the SEC has not met its

burden of proving that Ms. Roser violated the TRO.

Finally, any inference the court draws based on Mr. Brody's and Ms. Roser's Fifth

Amendment privilege is limited in scope and value, in large part because the substantive

---

[58]Mr. Reilly's declaration testimony relates solely to Patrick Brody.

[59]Frost Decl. ¶ 13.

questions posed did not paint a clear picture of any functioning scheme to defraud.  The Defendants may have contemplated such a scheme and may have attempted to carry out such a scheme, but the evidence before the court does not reach beyond that.  The SEC needs more evidence to convince the court that it should hold Mr. Brody and Ms. Roser in contempt for violation of the TRO.

**SEC's Request for Fees and Costs**

The SEC has requested an order requiring the Defendants to pay its attorneys' fees and expenses incurred in prosecuting this contempt matter.  Because the SEC's memorandum does not engage in analysis about why the SEC, a government agency, is entitled to attorneys' fees and costs, that portion of the motion is denied without prejudice.  If the SEC wishes to present a more substantial analysis of why the SEC is entitled to fees and costs, the court will consider the motion.

**ORDER**

For the reasons set forth above, **the court finds PATRICK M. BRODY and LAURA A. ROSER in CONTEMPT OF COURT** for violation of the Asset Freeze Order, and the court **ORDERS** as follows:

1.     The SEC's motion seeking an order holding Patrick Brody and Laura Roser in civil contempt (Docket No. 23) is granted in part and denied in part as stated in detail above.

2.     Patrick Brody and Laura Roser, and all those working in active concert or participation with them, **shall immediately transfer** any funds received from the improper dissipation of assets to the court-appointed Receiver, Wayne Klein.  In addition, they **shall immediately disclose** to the SEC and the Receiver the whereabouts of unsold and hidden tangible

22

assets subject to the Asset Freeze Order, and take all necessary steps to assist the Receiver in obtaining possession of those assets.  Mr. Brody and Ms. Roser must also **produce** all available documents related to the assets, including (but not limited to) how the assets were purchased, the amount of the purchase, to whom the asset was subsequently sold, and where the proceeds have been placed.  Mr. Brody and Ms. Roser must produce to the SEC the missing contents of the filing cabinet that was in their home office or, at a minimum, provide information on the location of those files.

3.      **The court hereby orders Laura Roser to self-surrender to this court on December 14, 2011, at 3:30 p.m. for incarceration (or be subject to arrest through a bench warrant)** if she is unable to prove by then, to the satisfaction of the court, that she has (a) complied with the mandate set forth in Paragraph 2 above; (b) has made full and genuine disclosures and cooperated in discovery, and (c) the court has had the opportunity to review the results of such disclosures and discovery, and is satisfied that the information provided is sufficient to purge Ms. Roser of her contempt.

4.      The court hereby schedules a hearing for the same time—**December 14, 2011, at 3:30 p.m.—to determine whether Laura Roser has purged herself of her contempt**.  If the court officially determines, before December 14, 2011, that Ms. Roser has satisfied the conditions set forth in Paragraph 3(a)-(c) above, the court will strike the hearing through written notice to all concerned. **Otherwise, by this order, Laura Roser is obligated to attend the hearing in person**.

5.      The court hereby orders **Patrick Brody**, upon release from federal prison, to **self-surrender to this court within 30 days of his release for incarceration (or be subject to arrest through a bench warrant)** if he is unable to prove by then, to the satisfaction of the court, that he has (a) complied with the mandate set forth in Paragraph 2 above; (b) has made full and genuine

disclosures and cooperated in discovery, and (c) the court has had the opportunity to review the results of such disclosures and discovery, and is satisfied that the information provided is sufficient to purge Mr. Brody of his contempt.

6.      Mr. Brody and the SEC are hereby ordered to inform the court when Mr. Brody is released from prison so that the court may immediately schedule a contempt hearing for Mr. Brody to determine whether Mr. Brody has purged himself of contempt.  If the court officially determines, before that date (still to be determined) that Mr. Brody has satisfied the conditions set forth in Paragraph 3(a)-(c) above, the court will strike the hearing through written notice to all concerned. **Otherwise, by this order, Patrick Brody is obligated to attend the hearing in person.**

DATED this 15th day of November, 2011.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge