IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> ART INTELLECT, INC. d/b/a MASON HILL and VIRTUAL MG; PATRICK MERRILL BRODY; LAURA A. ROSER; GREGORY D. WOOD, <br><br> Defendants. | ORDER <br> AND <br> MEMORANDUM DECISION <br><br> Case No. 2:11-CV-357 |

On April 18, 2011, Plaintiff Securities and Exchange Commission (SEC) brought this civil enforcement action against Art Intellect (d/b/a Mason Hill and VirtualMG) ("Mason Hill"), Patrick Brody, and Laura Roser.[1]  With Mason Hill now in receivership, SEC contends that Mr. Brody and Ms. Roser (Defendants), through their involvement with Mason Hill, have violated the federal securities laws by acting as unregistered brokers or dealers while fraudulently selling unregistered "investment contract" securities beginning as early as April 2009.

In October 2011, the SEC obtained a preliminary injunction.  Now the SEC moves for summary judgment on all of its claims against the Defendants, seeking a permanent injunction, disgorgement of ill-gotten gains, and imposition of civil monetary penalties.  The Defendants

---

[1]The SEC also filed suit against Gregory Wood.  Mr. Wood consented to entry of judgment and a permanent injunction against him in April 2011 and is no longer part of this case.

have filed a cross-motion for summary judgment, contending that they were not offering or selling "securities," a jurisdictional pre-requisite for SEC's suit against the Defendants.  In support of their cross-motion, the Defendants submitted three affidavits, all of which the SEC has moved to strike.[2]

For the reasons set forth below, the court GRANTS SEC's motions to strike the three affidavits, GRANTS SEC's Motion for Summary Judgment, and DENIES the Defendants' Cross-Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

Before going into the background of this case, the court notes that in 2002 the SEC pursued a similar civil enforcement action against Mr. Brody for his business dealings through a group of entities collectively referred to as Merrill Scott.  Ultimately, the court found that Mr. Brody violated the anti-fraud provisions and broker registration requirements of the federal securities laws, so it permanently enjoined Mr. Brody in May 2007,[3] ordered him to disgorge more than $16,000,000 in ill-gotten gains,[4] and imposed a civil monetary penalty of $110,000.[5]

The court also notes that in 2009, Mr. Brody was convicted of one misdemeanor count of failure to file a tax return reporting income received from Merrill Scott.[6]  He was sentenced to

---

[2]The court finds that oral argument would not materially assist the court in deciding the issues presented, so the court issues this order based on evidence taken during the preliminary injunction hearing and on the written briefs and supporting materials.

[3]See May 21, 2007 Order & Mem. Decision (Docket No. 977 in 2:02cv39 (D. Utah)).

[4]Id.

[5]Feb. 20, 2008 Order (Docket No. 1185 in 2:02cv39 (D. Utah)).

[6]See United States v. Brody, 2:08cr410 (D. Utah 2009).

serve ten months in custody and twelve months supervised release.  This all occurred before the action now before the court was filed.

When the SEC filed its complaint in the current case, it sought and received a temporary restraining order[7] (TRO) against the Defendants.  At the same time, the court issued an order freezing assets of Mason Hill and the individual defendants (the "Asset Freeze Order"),[8] and appointed a receiver, R. Wayne Klein (the "Receiver"), to marshal and preserve the assets.[9]  The court then scheduled a hearing to determine whether a preliminary injunction should be issued.

After the court issued the TRO and Asset Freeze Order, the SEC attempted to serve the documents on Mr. Brody and Ms. Roser, both of whom wilfully attempted to avoid service of the

_____

[7]Docket No. 4.

[8]Docket No. 5.

[9]In pertinent part, the Asset Freeze Order states:

> 3. Except as otherwise specified herein, all Receivership Assets are frozen until further order of this Court. Accordingly, all persons and entities with direct or indirect control over any Receivership Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets.

> 4. Defendants Patrick M. Brody, Laura A. Roser and Gregory D. Wood, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, or otherwise, and each of them, hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any assets, funds, or other properties . . . of Defendants Patrick Merrill Brody, Laura A. Roser and Gregory D. Wood currently held by them or under their control . . . .

(Asset Freeze Order ¶¶ 3-4.)

3

complaint, TRO, and Asset Freeze Order.[10]  About the same time, the SEC learned that Mr.

Brody and Ms. Roser had violated the Asset Freeze Order, and so it initiated contempt

proceedings by filing a motion for an order to show cause.

On June 23, 2011, the SEC, in preparation for the contempt and preliminary injunction

hearing, deposed Mr. Brody and Ms. Roser.  During the depositions, Mr. Brody and Ms. Roser

asserted their Fifth Amendment privilege against self-incrimination to every question concerning

the frozen assets and their involvement with Mason Hill and its affiliated entities.[11]

On June 29, 2011, and July 12, 2011, the court held two evidentiary hearings on the

motion for preliminary injunction and contempt issues raised by the SEC.  (See June 29, 2011

Hr'g Tr. (Docket No. 75) ("June Tr."); July 12, 2011 Hr'g Tr. (Docket No. 88) ("July Tr.").)  At

the hearings, the witnesses included Gregory Wood (a former president of Mason Hill), Thomas

Larkin (former CEO of Mason Hill), Tom Love (an investor with Mason Hill), and David Young

(an investor with Mason Hill).

During the preliminary injunction proceedings, the Defendants mainly contended that

they were not selling "securities" as defined by the federal securities laws so the court has no

jurisdiction.  That argument failed, and in October 2011, the court issued its Preliminary

Injunction Order against the Defendants.  The court preliminarily found that the Defendants were

selling securities called "investment contracts," that they misrepresented (and omitted) material

---

[10]For a complete description of the service difficulties faced by the SEC, the court refers
the reader to pages 14-15 of the court's Preliminary Injunction Order (Docket No. 134).

[11]See SEC Mem. Supp. Mot. Summ. J. (Docket No. 196) at 13-17 (listing specific areas
of questioning to which Mr. Brody and Ms. Roser asserted their Fifth Amendment privilege, and
citing to transcripts of the June 23, 2011 depositions).

facts to potential and actual investors, and that they engaged in a Ponzi scheme.[12]

Soon after that, on November 15, 2011, the court found that the SEC had proven, by clear and convincing evidence, that Mr. Brody and Ms. Roser, despite having notice of the action and orders, were in contempt of court for violating the Asset Freeze Order.[13]  Eventually, in May 2012, Mr. Brody and Ms. Roser purged themselves of contempt,[14] but getting to that point proved to be a difficult and drawn-out process.[15]

During the December 14, 2011 hearing regarding whether Ms. Roser had purged herself of contempt, Ms. Roser again asserted her Fifth Amendment privilege.[16]  After the court found the Defendants in contempt of court, they agreed to give deposition testimony in April and May 2012 in an attempt to purge themselves of contempt.  Although they did not assert their Fifth Amendment privilege at the subsequent depositions, the subject matter of those depositions, and consequently the extent of the waiver of the privilege, was very narrow, as described later in this order.

During that time, the SEC filed the motion for summary judgment currently before the court.  The Defendants filed a cross motion for summary judgment, primarily arguing that they

---

[12]See Preliminary Injunction Order (Docket No. 134).

[13]See Nov. 15, 2011 Civil Contempt Order & Mem. Decision (Docket No. 142).

[14]See May 14, 2012 Order Purging Civil Contempt (Docket No. 225).

[15]See Docket Nos. 163, 180, 182, 184, 188, 189, 192, 205, 207, 211, 214, 220, 223, 231, 225.

[16]See Dec. 14, 2011 Tr. of Evid. Hr'g (Docket No. 163).

5

were not selling "securities" as defined by the federal securities laws.  To support their cross

motion, the Defendants submitted the affidavits of Laura Roser, Patrick Brody, and David Helm.

The SEC then filed motions to strike those affidavits, which motions are now before the court.

## FACTUAL BACKGROUND[17]

Patrick Brody and his wife Laura Roser created Mason Hill, a company that solicited

investments in real estate.

Ms. Roser was the founder and president of Art Intellect, the CEO of Mason Hill, the

founder of VirtualMG, and the CEO of Mason Hill.  Ms. Roser wrote and managed all of the

marketing material of Mason Hill, including the website, brochures, webinars, and press releases.

She also interviewed and hired staff and had a position of control at Mason Hill.  But her

activities were overshadowed by Mr. Brody's behind-the-scenes management.

Mr. Brody in fact controlled the operations of Mason Hill.  For example, he solicited

investors, recruited employees, made hiring decisions, was involved in the day-to-day operations

of Mason Hill, called himself a financial director for the company, directed how funds of the

company would be spent, and essentially acted as a de facto CEO.  Nevertheless, Mr. Brody

---

[17]The evidence for the facts presented in this order was taken from evidence submitted in
preparation for and during the court's preliminary injunction hearings as well as documentation
produced by the parties in support of their cross-motions for summary judgment.  There are two
exceptions to that.  For the reasons discussed below, the court strikes all or a portion of the recent
affidavits of Patrick Brody, Laura Roser, and David Helm.  Second, in support of their Reply
supporting their cross-motion, Defendants filed affidavits of "customers."  (See Docket No. 270
Ex. 1.)   The court does not consider those affidavits because they were untimely and
inappropriately submitted to the record for the first time in support of the Defendants' reply
memorandum.
    Nothing else referred to by the Defendants in their opposition disputes the facts set forth
by the SEC in its Statement of Undisputed Facts or the evidence taken by the court during the
evidentiary hearing on the motion for preliminary injunction.

largely kept his name off of any entity or property owned or controlled by Mason Hill.

Because Mr. Brody and Ms. Roser controlled Art Intellect, Inc., Mason Hill, and VirtualMG accounts, they moved and controlled investor money at will.  Representatives and employees of Mason Hill solicited investors and acted on behalf of Mason Hill at the direction of Laura Roser and Patrick Brody.  In this Order, when the court refers to "Mason Hill," the term includes Ms. Roser and Mr. Brody, whose representatives made the sales pitch at their direction.

Neither Mr. Brody nor Ms. Roser has ever been registered in any capacity with the SEC or any other securities regulatory agency.  And Mason Hill did not register its offer and sales with the SEC.

**The "Hassle Free" Turnkey "Mason Hill Real Estate Investment Model"**

Mason Hill offered "The Mason Hill Real Estate Investment Model" to prospective investors, who entered into a "Reservation Agreement" and "Real Estate Purchase Agreement" with Mason Hill.  Mason Hill attracted approximately 75 investors and raised at least $2.5 million.  Mason Hill solicited investors through its website, through "webinar" presentations, and through other communications with investors.  Mason Hill also engaged a network of "strategic partners" to solicit investors nationwide in exchange for a "referral fee."

The Mason Hill model offered a "turnkey" approach to real estate investing.  Specifically, Mason Hill claimed that it purchased distressed real estate at a low price, rehabilitated the properties and secured tenants, all for the investors.  In addition, Mason Hill told investors that it would collect the rents and maintain the properties.[18]   In short, it promised investors a "hassle

---

[18]A majority of Mason Hill investors chose to use Mason Hill's property management service.

free" option for real-estate investing.

For example, on its website, Mason Hill published a brochure entitled "What Everyone Should Know About the Mason Hill Real Estate Investment Model."[19]  It started out with the following: "How a new kind of real estate investment can produce a 14% to 26% cash-on-cash return, year after year . . . even if you never lift a finger to manage the properties, fix the properties or find a tenant. . . ."[20]  On the same website, under the heading "Turnkey *Cash Flow*," Mason Hill advertised a "LIVE webinar" called "The Hassle Free Investment: Generate Passive Income Through Real Estate."[21]

Mason Hill told investors that it maintained an inventory of properties in desirable areas in Florida, Ohio, and Kansas, with increasing property values that it would sell to investors at a substantial discount.  Mason Hill represented that it acquired properties in bulk from banks, allowing it to obtain the properties at lower prices than could an individual investor.  Mason Hill further represented that the properties were "newer" (built in 2004 to 2007 or later) and that Mason Hill refurbished all properties to "near-new" condition, with new paint, remodeled kitchens, new appliances, and all repairs so that the properties would be attractive to tenants.

Mason Hill claimed that it had an on-site, in-house property management team that screened and placed tenants so that the properties would already be rented and the investor could immediately obtain an income stream from a purchased property.  According to Mason Hill, "Reliable renters want to live in these properties – tenants with a better track record of on-time

---

[19]Ex. 1 attached to Mem. Supp. Mot. TRO (Docket No. 3) at 74.

[20]Id. (emphasis added).

[21]Id. at 83 (emphasis added); see also id. at 101 ("We do it all for you.").

payments, good employment history, and a clean background.  We have an on-site property

management team with a <u>waiting list of these tenants</u> – delivering an <u>average occupancy rate of</u>

<u>93% for all of our properties</u>."[22]

Mason Hill explained that it would manage the property after purchase, handle all

maintenance, services, and rent collection, and that it would provide clients with a monthly

payment and cash flow report.[23]  Mason Hill promised investors returns that ranged from 10% to

30%, with monthly net rental profits of $650 to $1000 or more.  This was touted as a passive

investment, and that is what attracted and motivated investors.  Given the nature of the

investment, the incentives, and the promised returns, any appreciation in value was of secondary

importance.[24]

Mason Hill told investors that they could reserve a Mason Hill property with a

"reservation deposit" of $20,000.  Investors were given information sheets and photographs of

specific properties that Mason Hill purportedly owned and had available.  Mason Hill created a

sense of urgency to push investors to make reservation deposits by claiming prices would be

---

[22]Turnkey Cash Flow brochure, attached as Ex. 1 to Mem. Supp. Mot. TRO (Docket No. 3), at 117 (emphasis added).

[23]Although the property management service was not a requirement after the property was purchased through Mason Hill, it was offered as an incentive to prospective investors, and it was one of the features that attracted investors.  <u>See, e.g.</u>, Testimony of Gregory Wood in July Tr. at 152; Love Testimony in June Tr. at 29, 33; Young Testimony in June Tr. at 47; Larkin Testimony in June Tr. at 94, 102-03.  <u>See also</u> SEC's Mem. Supp. Mot. Summ. J. (Docket No. 196) at 7 n.37.  Sometimes the investor chose to use a different entity to manage the property, but that option was not always articulated to investors, and, in some instances, Mason Hill offered the services for one year at no cost to the investor.

[24]<u>See, e.g.</u>, Love Testimony in June Tr. at 30; Young Decl. ¶ 10; Young Testimony in June Tr. at 47, 51, 66-67.

going up soon or that there was a waiting list and the property would only be available for a short time before someone else reserved it. Once investors decided to invest, they executed Reservation Agreements and sent Mason Hill $20,000 per property. Mason Hill claimed that these payments would be placed in an escrow account and applied as down payments toward the purchase of individual properties. Mason Hill stated that transactions could be completed within 30-60 days and that investors would begin receiving monthly rental payments almost immediately thereafter. Mason Hill also represented to investors that if they needed a mortgage for part of the purchase price, Mason Hill offered in-house seller financing or it would arrange financing of non-recourse loans from other lenders. Mason Hill told investors that they could use IRA or 401(k) funds to purchase the properties and that it would assist with these transactions.

**<u>Misrepresentations</u>**

Mr. Brody and Ms. Roser made misrepresentation to investors regarding (1) Mason Hill's purchasing arrangements, ownership, availability, and condition of the investment properties; (2) availability of financing of investment properties and returns on investments; and (3) Mason Hill's use of investors' funds. It also hid evidence that Mason Hill was operating as a Ponzi scheme, and it failed to disclose Mr. Brody's involvement with Mason Hill, his tax conviction, and his earlier securities law violations.

<u>Misrepresentations Regarding Investment Properties</u>

Mason Hill never purchased properties at discounts, but rather purchased properties individually at the same price at which the properties could be obtained by an individual investor, so investors did not receive steep discounts on the properties

Mason Hill, in fact, did not maintain an inventory of properties that could be sold to

investors.  Indeed, many investors were told that Mason Hill had purchased a specific property,

only to discover later that Mason Hill had either (a) not purchased the real estate at all or (b) had

purchased a different property with the investors' funds.  Mason Hill's website included

properties that were not actually owned by Mason Hill.  Many of the properties Mason Hill

purchased were not rehabilitated.  Instead, many properties were in a state of disrepair and were

not in rentable condition.  Properties were sold to investors without tenants despite Mason Hill's

guarantee that the properties would be rented with reliable tenants and long-term leases at the

time of closing.

Tom Love, an investor with Mason Hill, signed four reservation agreements for four

properties offered by Mason Hill.  Mr. Love gave Mason Hill a total of $80,000 in reservation

deposits.  After receiving Mr. Love's deposit money, Mason Hill suggested that Mr. Love buy

four properties in Florida.  Mr. Love, after reviewing the properties, decided to accept two of the

properties and rejected two others. The two properties accepted by Mr. Love, to his surprise,

were withdrawn without explanation.

After Mason Hill withdrew the properties and failed to present other properties, Mr. Love

reluctantly became a private lender in the amount of the reservation deposits he had already given

to Mason Hill.  Mr. Love accepted the private lender agreement for the $80,000 with the

expectation that the amount would be repaid with interest.  Mr. Love received six months of

payments, totaling approximately $6,800. The payments suddenly stopped. When Mr. Love

contacted Mason Hill regarding its failure to make payments to him, various Mason Hill

employees told him that Mr. Brody was in control of everything.  In fact, Mr. Brody made the

decision to withdraw the properties originally offered to Mr. Love.  Subsequently, Mr. Love

11

discovered that many of the properties previously offered to him were either given to other Mason Hill investors or were not owned by Mason Hill.

During a visit to Florida, Mr. Love discovered that the properties were built decades earlier.  In fact, Mr. Love discovered that none of the properties offered to him were "like new," as Mason Hill represented.  For example, one of the properties was in a state of disrepair – "like a war zone [] with all the trash and junk all around."[25]  Other properties offered did not have the sewer connected, required air conditioning units, and needed significant landscaping.  The properties were not suitable for occupancy by tenants.

Mr. Love expected to profit from his initial investment of $80,000 with Mason Hill. His expectations were a direct result of Mason Hill's and its employees' representations to him through various webinars, the national sales manager, Bruce Bowen, the strategic partner director, Steve Saunders, and Michael Keith.  Investors like Love, in turn, expected a passive investment.  Mason Hill promised to find renters and have properties occupied before the property was turned over to the investor. Investors expected to incur no effort in maintaining the property.

David Young, another investor with Mason Hill, met Mr. Brody in 2009.  Initially, Mr. Brody provided flyers to Mr. Young and actively promoted Mason Hill.  Mr. Brody represented that the real estate owned by Mason Hill was very cheap, in good condition, and easy to rent. Mr. Brody described Mason Hill as a turnkey operation, involving new or like-new properties that could rent for between $625 and $650 a month per unit.  Mr. Brody presented Mason Hill as

---

[25]Love Testimony in June Tr. at 21.

a "passive investment" in which (1) the investor gives money; (2) Mason Hill manages

everything; and, (3) the investor, in turn, generates a return on the investment.  The return was to

come from the rents on the properties; any appreciation in the value of the properties was

considered merely fortuitous.

Mr. Young purchased thirteen duplex properties.  Mason Hill did not originally own, as

represented, many of the thirteen properties later purchased by Young.  Rather, Mason Hill

would purchase the property shortly after entering into an agreement with the investor.  Some of

the properties were switched. Mason Hill would promise certain properties, sign agreements, but

purchase different properties.

The rental income, as Mr. Young subsequently learned, was overstated.  Mr. Young

periodically received a monthly rent roll indicating rented properties and the income generated

from those properties.  Young relied on the accuracy of the rent rolls.  In reality, little was going

as planned.  In particular, one property was left completely unfinished, requiring nearly $75,000

in work.  Yet Mason Hill represented to Mr. Young, through the rent rolls, that the unfinished

property was generating rent.  But there were no tenants, and the putative rent payments were

falsified by Mason Hill to mislead Mr. Young and other investors.

Thomas Larkin is the former CEO of Mason Hill.  During his tenure at Mason Hill, Mr.

Larkin became aware of a number of misrepresentations that Mason Hill, through its employees

and marketing materials, was making to investors, including (1) the promise of a 12 to 14 percent

return; (2) that Mason Hill owned the properties offered; and, (3) that Mason Hill had credit lines

with lenders.

Mr. Larkin personally conducted an audit of all Mason Hill properties. As a result of the

13

audit, he discovered that 30% of properties were unoccupied and another 20% were tenanted but with tenants not paying rent.  Five to eight properties were in serious disrepair. Several properties listed on internal Mason Hill documents as belonging to a specific investor, in reality, did not. Properties purchased by Mason Hill were often obtained by simultaneous closings in which Mason Hill purchased the property on the same day that it sold the property to an investor.

Initially, Mr. Larkin had a difficult time obtaining Mason Hill's records.  After pressuring Mr. Brody and Ms. Roser for information and documentation, Mr. Larkin formed a better understanding of the extent of the fraud.  Mr. Larkin's scrutiny of Mason Hill's records revealed that Mr. Brody and Ms. Roser's expenses were lumped under a marketing payment to a related company, VirtualMG.  Mr. Larkin approached Ms. Roser to discuss the fraudulent operation of Mason Hill.  Following the conversation, in which Ms. Roser, indifferent, directed Mr. Larkin's concerns to Mr. Brody, Mr. Brody admonished Mr. Larkin for bringing the issues up with Ms. Roser.  Mr. Brody claimed to be the "de facto C.E.O. . . . in charge of Mason Hill for 22 months"[26] and that all conversations concerning Mason Hill's financial situation were to be had with him.  During their conversation, Mr. Larkin spoke with Mr. Brody about the fraudulent nature of Mason Hill's operation, exorbitant personal expenses of Mr. Brody and Ms. Roser, and cited several misuses of escrowed investor funds by Mr. Brody and Ms. Roser, including a hot tub, personal assistants' salaries, an extravagant trip to New York and restoration of cars.

Gregory Wood, a former president of Mason Hill, described how many of the representations made in Mason Hill's website and elsewhere were false or misleading.  Mason

---

[26]June Tr. at 105.

Hill never purchased properties in bulk at discounts.  In fact, Mason Hill purchased properties individually at the same price at which an individual investor could obtain the properties. Consequently, investors did not receive steep discounts on the properties as Mason Hill and its employees and agents represented.  Mr. Wood admitted that Mason Hill often did not own properties advertised on its website as available.

Mr. Wood stated that not all properties were turnkey ready, because the properties were not refurbished to near-new condition, as represented.  He also said that Mason Hill had outsourced property management to other companies, even though the website stated it had in-house, on-site property management.  Mr. Wood admitted that Mason Hill was not able to arrange financing or provide seller financing, as was represented on the website and elsewhere. Mr. Wood further stated he had previously discussed the website and the misleading statements with Ms. Roser.  Ms. Roser wrote and was responsible for all the marketing materials and programs for Mason Hill, including the website, brochures, and webinars.  In spite of this, Ms. Roser refused or failed to make changes to the website and other marketing materials to remove the misleading nature of the representations.

<u>Misrepresentations and Omissions Regarding Monetary Arrangements and Use of Investors' Funds</u>

Investor funds were commingled and later used for the personal expenses of Mr. Brody and Ms. Roser.  Mason Hill told investors that once they reserved a property and paid a reservation deposit, the funds would be placed in escrow and applied to the purchase price of the property at closing.  Rather than placing funds in escrow, Mason Hill commingled reservation deposits with Mason Hill's operating accounts.  Mr. Brody told Mason Hill employees that

Mason Hill was entitled to do whatever it wanted with investor deposits, because the deposits were non-refundable.  Mason Hill did not tell investors that their deposits were non-refundable or that Mason Hill could use investor funds as it determined.

Investor funds were used to pay Mason Hill's operating expenses, sales commissions, and the lavish personal expenses of Mr. Brody and Ms. Roser.  Mr. Brody and Ms. Roser misappropriated at least $1,367,250 from investors.

Ponzi Scheme

Mason Hill operated as a Ponzi scheme.  Returns to investors were funded from the principal sums of newly-attracted investors.  Later investor funds were used to purchase properties for earlier investors and to make putative profit payments to earlier investors, even when properties had not been purchased or rented as promised.  In fact, Mason Hill did not complete transactions as promised for a number of investors.  Mr. Brody maintained that Mason Hill was entitled to do whatever it wanted with investor deposits because the deposits were non-refundable.

Thomas Larkin stated that while he worked at Mason Hill, he became convinced that Mason Hill was operating as a Ponzi scheme.  Mr. Larkin made this determination when Patrick Brody directed him to use funds from new investors to purchase properties for earlier investors.  Based on this knowledge, Mr. Larkin concluded Mason Hill could not continue as a profitable operation, and he resigned from Mason Hill.[27]

---

[27]His tenure with Mason Hill, from approximately August to October 2010, was brief.  He left Mason Hill based on his concerns of personal liability stemming from his liability to "effect a business model that was not bordering on fraudulent."  (June 29, 2011 Tr. at 72.)

<u>Misrepresentations and Omissions Regarding Mr. Brody's Position, Misdemeanor
Conviction, and Earlier Securities Laws Violations</u>

Mason Hill, under the direction of Mr. Brody and Ms. Roser, did not inform any investors

that Mr. Brody was a control person and de facto officer or director of Mason Hill.  Mason Hill

also failed to disclose to any investors that Mr. Brody had been formerly found in violation of the

federal securities laws and guilty of tax evasion.

<u>The Misrepresentations and Omissions Were Material</u>

The SEC presents testimonial evidence from investors who stated that if they had known

the facts as set forth above, they would not have invested with Mason Hill.

**Continuation of Similar Enterprise**

Even after receiving notice and proper service of the Complaint, other pleadings and

court orders (including the TRO and Asset Freeze Order) in this case, Mr. Brody continued to

recruit sales people and to solicit investor funds in a scheme almost identical in nature to Mason

Hill.[28]  Mr. Brody and Ms. Roser used the entity names "Jensen Blair" and "Residential Realty

Advocates" to perpetuate their scheme.  Mr. Brody represented himself to at least one potential

salesperson as "Patrick Merrill" in an apparent attempt to hide his connection to Mason Hill.  As

with other topics, during Mr. Brody's deposition, when SEC counsel asked Mr. Brody whether

he attempted to establish a business venture in Ireland, Mr. Brody's response was, "I take the

Fifth."[29]  When SEC counsel asked if Mr. Brody was "familiar with the term Jensen Blair," he

---

[28]<u>See</u> Declaration of Ryan Reilly (Ex. 3 to Civil Contempt Mem. (Docket No. 24)) ¶¶ 2-3, 5-7, 9; May 13, 2011 Declaration of Stacie Parker (Ex. 8 to Mem. Supp. Mot. Summ. J. (Docket No. 196)) ¶ 9; Declaration of Scott Frost (Ex. 2 to Civil Contempt Mem.) ¶¶ 9, 13.

[29]June 23, 2011 Dep. of Patrick M. Brody (Docket No. 256-2) at 57.

once more exercised his Fifth Amendment rights.[30]

## ANALYSIS

The SEC alleges that the Defendants have violated the following anti-fraud provisions of the federal securities laws: Section 17(a) of the Securities Act of 1933[31] ("Securities Act"); Section 10(b) of the Securities Exchange Act of 1934[32] ("Exchange Act"), and the related Rule 10b-5; and Sections 5(a) and (c) of the Securities Act.[33]  SEC also alleges that Mr. Brody and Ms. Roser violated Sections 15(a) and 15(b) of the Exchange Act[34] when they acted as broker-dealers in offering and selling Mason Hill investment contracts and failed to register with the SEC as broker-dealers.

### SEC Motions to Strike Affidavits

SEC has moved to strike the most recent affidavits of Laura Roser, Patrick Brody, and David Helm, all of which were submitted in opposition to the SEC's motion for summary judgment and in support of the Defendants' cross-motion for summary judgment.

#### Affidavits of Laura Roser and Patrick Brody

The SEC contends that the court should strike the affidavits of Ms. Roser and Mr. Brody because both Defendants invoked their Fifth Amendment privilege against self-incrimination

_____

[30]Id.

[31]15 U.S.C. § 77q(a).

[32]15 U.S.C. § 78j(b).

[33]15 U.S.C. §§ 77e(a), (c).

[34]15 U.S.C. § 78o(a)-(b).

during their June 23, 2011 depositions.[35]  The SEC characterizes their affidavit testimony as

"belated, self-serving testimony in an eleventh-hour endeavor to defeat the Commission's

Motion for Summary Judgment" against them.  (SEC Mems. Supp. Mots. Strike (Docket Nos.

254, 256) at 2.)  The SEC also contends that the Defendants' affidavit testimony is "rife with

legal and/or expert testimony and/or lacks foundation and is not admissible."  (Id. at,

respectively, p. 2, p. 3.)  The court agrees with both bases for striking the affidavits.

The proposition that a witness's testimony may be stricken when a deponent asserts the

Fifth Amendment privilege against self-incrimination in a civil case is "well accepted."  United

States v. Parcels of Land, Etc., 903 F.2d 36, 44 (1st Cir. 1990).  Courts recognize the inherent

unfairness in permitting a defendant to assert the privilege against self-incrimination while

simultaneously attempting to offer evidence supporting his or her case. Id.

Here, the SEC took Ms. Roser's and Mr. Brody's deposition on June 23, 2011. During

their depositions, both asserted the Fifth Amendment privilege to nearly every question the SEC

asked regarding Art Intellect, Inc.'s, VirtualMG's and Mason Hill's business operations.  (See Tr.

of June 23, 2011 Deposition of Laura Roser (Ex. A to Docket No. 254) at pp. 21–42; see

generally Tr. of June 23, 2011 Deposition of Patrick Brody (Ex. A to Docket No. 256); see also

SEC's Analysis of Roser Affidavit (Docket 254) at 2-11; SEC's Analysis of Brody Affidavit

(Docket No. 256) at 2-15.)  But on July 13, 2012, the Defendants filed affidavits generally

addressing Art Intellect, Inc.'s, VirtualMG's and Mason Hill's business operations.

---

[35]On October 31, 2012, Mr. Brody and Ms. Roser were indicted and charged with
conspiracy, fraud and money laundering in connection with their activities at Mason Hill.  That
case is ongoing.  (See United States v. Brody, Case No. 2:12-cr-680-RJS-PMW (D. Utah).)

A party may assert the privilege against self-incrimination during civil as well as criminal proceedings.  But during civil proceedings, "because the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent."  SEC v. Graystone Nash, Inc., 25 F.3d 187, 190 (3d Cir. 1994).

Certainly the court may not punish the Defendants for invoking the privilege during their depositions.  Civil procedures recognize the need for exercise of the privilege and "provide no basis for inflicting sanctions when there is a valid invocation of the Fifth Amendment."  Id. at 191.  It would be improper to impose a complete bar on presenting any evidence, or to grant summary judgment solely in response to a valid invocation of the privilege.

But a limitation on sanctions does not immunize the party invoking the privilege from adverse consequences in the civil litigation setting.  For instance, according to the United States Supreme Court, it is permissible to draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).  The Supreme Court has also noted that "the fact that a litigant may be forced to choose 'between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.'"  United States v. Certain Real Property and Premises Known as 4003-4005 5th Ave., Brooklyn, NY, 55 F.3d 78, 83 n.3 (2d Cir. 1995) (quoting Williams v. Florida, 399 U.S. 78, 83-84 (1970)).  "In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well."  Graystone Nash, Inc., 25 F.3d at 191.  Consideration of the other litigant's rights continues even when the party invoking the

privilege attempts to waive it later in the proceedings, as in the Defendants' case.  "The Fifth
Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a
party's assertions."  SEC v. Zimmerman, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (distinguishing
situation where party invoking privilege is a defendant in both civil and criminal cases and is
forced to choose between waiver of the testimonial privilege in the criminal case and automatic
entry of an adverse judgment in a civil case).

To determine whether the Defendants' affidavits should be stricken, the court must
examine how and when the privilege was invoked, how and when it was waived, the nature of
the proceeding, and any resulting prejudice to the opposing party.  4003-4005 5th Ave., 55 F.3d
at 84-86.  Further, the court must "carefully balance the interests of the party claiming protection
against self-incrimination and the adversary's entitlement to equitable treatment.  Because the
privilege is constitutionally based, the detriment to the party asserting it should be no more than
is necessary to prevent unfair and unnecessary prejudice to the other side."  Graystone Nash, Inc.,
25 F.3d at 192.

Nothing in the record indicates that Ms. Roser or Mr. Brody improperly invoked the
privilege in June 2011 when they were deposed.  And SEC does not argue otherwise.

But the context and timing within which they waived their privilege is troubling.  Here,
Ms. Roser and Mr. Brody invoked the Fifth Amendment privilege during civil discovery in an
SEC enforcement action.  Neither Ms. Roser nor Mr. Brody submitted sworn testimony
concerning their activities with Mason Hill until more than a year after invoking their privilege
and after the conclusion of fact discovery.  More importantly, they waived the privilege after the
SEC had moved for summary judgment, and, consequently, had an opportunity to tailor their

responses to the motion.  Faced with this "eleventh hour" waiver, the court believes that striking

their affidavits is an appropriate measure.  Other courts have done the same in similar

circumstances.  See, e.g., SEC v. Hirshberg, 173 F.3d 846, Case Nos. 97-6171 & 97-6259, 1999

WL 163992 (2d Cir. Mar. 18, 1999) (table decision) (precluding evidence of defendant who

waived Fifth Amendment privilege after SEC filed summary judgment motion, finding that it

would be prejudicial to SEC to allow defendant, who waited four years to respond to the motion,

to tailor his affidavit to create an issue of fact for trial); 4003-4005 5th Ave., 55 F.3d at 85

(noting that if litigant's waiver of privilege comes at "eleventh hour" and "appears to be part of a

manipulative, 'cat-and-mouse' approach to the litigation, a trial court may be fully entitled . . . to

bar a litigant from testifying later about matters previously hidden from discovery through an

invocation of the privilege"); In re Edmond, 934 F.2d 1304, 1308 (4th Cir. 1991) ("By

selectively asserting his Fifth Amendment privilege, [the defendant] attempted to insure that his

unquestioned, unverified affidavit would be the only version [of his testimony].  But the Fifth

Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for

the limited purpose of making statements to support a summary judgment motion."); United

States v. Parcels of Land, 903 F.2d 36, 43-44 (1st Cir. 1990) (affirming order striking affidavit

opposing government's summary judgment motion when witness "shielded his account of the

'facts' from scrutiny by invoking the Fifth Amendment at his deposition."); SEC v. Softpoint,

Inc., 958 F. Supp. 846, 857 (S.D.N.Y. 1997) (noting that defendant's waiver of privilege three

months after SEC moved for summary judgment was "convenient" and that defendant "simply

may not invoke his privilege against self-incrimination to impede the government's discovery

efforts and then seek to waive the privilege when faced with the consequences of his refusal to

testify."); <u>SEC v. Grossman</u>, 887 F. Supp. 649, 660 (S.D.N.Y. 1995) (precluding evidence at summary judgment stage on the issues for which the defendants had "declined to provide discovery for several years" under the guise of the Fifth Amendment privilege against self-incrimination); <u>SEC v. Zimmerman</u>, 854 F. Supp. 896, 899 (N.D. Ga. 1993) ("The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions.").

Acceptance of the last-minute affidavits would cause substantial prejudice to the SEC. One purpose of discovery is to ascertain the position of the adverse party on controverted issues. Discovery determines what the facts are and what your opponent contends the facts are and what purpose they will serve. The ability to cross-examine an adverse party also provides an opportunity to test that party's credibility. The SEC's ability to obtain discovery from a defendant "will have a definite impact on the course of the SEC's discovery and should be obtained at the outset of discovery. It is likely that the SEC will pursue different avenues of discovery depending on [the defendant's] decision [to testify or invoke the Fifth Amendment privilege]." <u>SEC v. Cymaticolor Corp.</u>, 106 F.R.D. 545, 550 (S.D.N.Y. 1985).

After Ms. Roser's and Mr. Brody's June 2011 depositions, the SEC deposed several individuals, including Mason Hill employees and other third parties. Many of those depositions took place outside the District of Utah. The SEC took those depositions without the benefit of Ms. Roser's and Mr. Brody's version of the events. As a result, the SEC lacked the ability to test the Defendants' assertions during the depositions of investors or Mason Hill employees. While the SEC developed its own case, it did not have the opportunity to rebut Ms. Roser's or Mr. Brody's case. The SEC lost the opportunity to examine the Defendants' theories through other

witnesses.

The Defendants contend that after they exercised their Fifth Amendment privilege on June 23, 2012, the circumstances changed and they did willingly give testimony during subsequent depositions and in other circumstances.  In particular, they point to testimony on the stand during contempt proceedings, affidavit testimony presented to purge themselves of civil contempt, and representations in their court briefs.  They suggest that their later acquiescence removes any reason to strike their affidavits.  But what they waived after their initial depositions in their later testimony was a narrow area of inquiry.  The post-June 2011 testimony focused solely on asset information needed to purge Mr. Brody and Ms. Roser of contempt.  Ms. Roser's counsel makes that point clear at the beginning of Ms. Roser's April 2012 deposition:

> It is our understanding . . . that the Notice, which consists of the Court's Order, is confined in this matter to questions to exonerate Ms. Roser from contempt of court. . . .
>
> It is also not my understanding that this is to go beyond the scope of the exonerating of her from the issue of contempt of court and into the balance of the proceedings.  It is abundantly clear from the Court's Order that with respect to the issues involving contempt, that she is not permitted to the take the Fifth Amendment, and she's been told that she cannot do so.
>
> As to the underlying case, she does, we believe, still have the ability to take the Fifth Amendment.

(Tr. of April 23, 2012 Dep. of Laura A. Roser (Docket No. 254-4) at 4-5.)  Counsel for the SEC agreed and noted "for the record that [the SEC] will be talking about solely issues related to the contempt before the Court," to which Ms. Roser's counsel responded, "That was my understanding."  (Id. at 6.)  Mr. Brody's May 10, 2012 deposition was likewise limited to asset matters relating to the contempt finding.  (See Docket No. 256-4.)

Given case law precedent and the facts of this case, the court rejects Ms. Roser's and Mr. Brody's attempts to waive their privilege in this context, and, consequently, strikes Ms. Roser's affidavit and Mr. Brody's affidavit.

The court also notes that Ms. Roser's and Mr. Brody's affidavits contain multiple conclusory statements that take the form of legal conclusions and improper expert opinions. For example, Ms. Roser offers legal opinions about whether Mason Hill's investment contract is a security and whether Mason Hill operated as a Ponzi scheme. Under Rule 701 of the Federal Rules of Evidence, the court strikes those portions of the affidavits noted by the SEC in its analyses of the two affidavits.

For the foregoing reasons, the SEC's Motion to Strike Affidavit of Laura Roser (Docket No. 253) and SEC's Motion to Strike Affidavit of Patrick M. Brody (Docket No. 255) are granted.

<u>Affidavit of David Helm</u>

The SEC asks the court to strike David Helm's 55-paragraph affidavit (Docket Nos. 237, 243) in its entirety on the bases that (1) it is "rife with conclusory, self-serving statements and [unqualified] legal or expert opinions;"[36] (2) portions contradict his August 2011 deposition testimony; and (3) portions lack foundation or are not relevant.

Parties may use affidavits to support or oppose a motion for summary judgment. Fed. R. Civ. P. 56. The opposing party may not rely on simple denials or allegations in either its pleading or affidavits. Rather, the opposing party's response must set forth specific facts

---

[36]SEC Mem. Supp. Mot. Strike Helm Aff. (Docket No. 258) at 2.

showing a genuine issue for trial, and such facts must be supported by affidavits or other

admissible evidence.  Fed. R. Civ. P. 56(c).  "Nonmovant's affidavits must be based upon

personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-

serving affidavits are not sufficient."  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir.

1995).  Mr. Helm's deposition shows that he lacks personal knowledge of many of the facts set

forth in his affidavit.

    According to Mr. Helm's affidavit, he is a resident of Florida and was employed by

Mason Hill from August 5, 2010, until Mason Hill was taken over by the Receiver in April 2011.

But later in the affidavit he says he "established Mason Hill Property Management in Florida in

2009."  (See Helm Aff. ¶ 5.)  The SEC presents evidence that fully contradicts Mr. Helm's

statement.  (See SEC's Mem. Supp. Mot. Strike Helm Aff. (Docket No. 258) at 4.)

    Mr. Helm had a real estate license in Utah and has a real estate broker's license in

Florida.  According to the SEC, before Mr. Helm relocated to Florida to work for Mason Hill, he

worked in Utah at Morris Travel, JG Hunter Construction and DCH Holdings.  He has completed

three quarters of university level classes, but the subject of that education is not in the record.

Nothing in his affidavit suggests that he is a real estate industry expert, yet he makes general

statements throughout his affidavit about standard industry practices, trends, or understandings of

real estate purchases.

    Large sections of Mr. Helm's affidavit directly contradict the sworn testimony he

provided during his August 2, 2011 deposition.  In addition, paragraphs 8, 37 and 48 within the

affidavit contradict one another.  These portions of Mr. Helm's affidavit attempt to create a sham

issue of fact.  "In determining the existence of material facts for the purpose of summary

judgment, a court may disregard an affidavit that conflicts with the affiant's prior testimony if the court determines the affidavit constitutes an effort to create a sham issue of fact." FrontRange Solutions USA, Inc., NewRoad Software, Inc., Civil Action No. 04-cv-01969-WDM-MJW, 2007 WL 2580479, at *1 (D. Colo. Aug. 31, 2007) (citing Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).)

In determining the existence of a "sham fact" issue, relevant factors include "whether the affiant was cross-examined during his earlier deposition testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly-discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." Id. Mr. Helm was not cross-examined at his August 2011 deposition; in fact, he was not represented. But he did confer with Defendants' counsel before he gave his deposition testimony.

Mr. Helm had ample access to the evidence the SEC used as exhibits during his deposition. He provided many of the exhibits SEC's counsel incorporated as exhibits during his deposition. His affidavit is not an effort to introduce newly-obtained evidence. He does not attach any new documents to support his affidavit. And it certainly does not clarify his earlier, sworn deposition testimony. It contradicts itself internally and his earlier testimony. It makes no effort to explain the inconsistencies.

Mr. Helm's affidavit is also problematic because it contains multiple paragraphs of lay testimony in the form of legal conclusions and unqualified expert opinions. Mr. Helm is not an attorney. He has not been qualified as an expert of any type. Under the evidence rules,

If the witness is not testifying as an expert, testimony in the form of an opinion is

27

> limited to one that is (a) rationally based on the witness's perception; (b) helpful
> to clearly understand the witness's testimony or to determine a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the
> scope of Rule 702.

Fed. R. Evid. 701.

Here, Mr. Helm improperly offers testimony on issues that fall beyond the bounds of Rule

701.  He offers legal conclusions about whether Mason Hill's investment contract is a security;

whether Mason Hill operated as a Ponzi scheme; and whether Mason Hill fulfilled its contractual

obligations.  He also offers testimony that is the subject of a forensic accounting expert.  (See

SEC's Mem. Supp. Mot. Strike Helm Aff. (Docket No. 258) at 43.)  He provides opinions

regarding the real estate industry.  Although Mr. Helm had a real estate license in Utah and

currently maintains a real estate broker's license in Florida, he has not been qualified as a real

estate industry expert.  While he may be able to opine about certain subjects based on his

experience as a real estate agent, the opinions he actually offers — a description of the real estate

industry and trends within it — falls within the definition of specialized knowledge that is

excludable when the witness has not been qualified as an expert.  Accordingly, his testimony

regarding common real estate industry practices is inadmissible.

Finally, the information he presents is conclusory and does not offer evidence that creates

a genuine dispute of material fact.

There are many problems with Mr. Helm's affidavit.  The SEC points out these problems

in detail, so the court will not reiterate what is in the SEC's brief.  Instead, for the reasons set

forth above and in the SEC's Motion to Strike the Affidavit of Mr. Helm, that motion is granted

and the Affidavit of David Helm is hereby stricken from the record.

**Cross Motions for Summary Judgment**

In its motion, the SEC seeks summary judgment, a permanent injunction, disgorgement, and penalties.  Defendants, in their cross-motion, dispute the SEC's contention that raise the Defendants offered or sold a security as that term is defined in the federal securities laws.

Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if it demonstrates, through pleadings, depositions, answers to interrogatories, admissions on file, and/or affidavits, that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The opposing party's response must set forth specific facts showing a genuine issue for trial, and it "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."  Anderson, 477 U.S. at 252.

**A.**   **The Defendants Sold Securities Known As Investment Contracts.**

To prevail, the SEC must first establish that Mr. Brody and Ms. Roser offered or sold a "security."  The term "security" is defined to include any "investment contract."  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  An investment contract is a security if it involves (1) investment of money; (2) in a common enterprise; (3) with profits derived solely from others' efforts.  SEC v.

29

<u>W.J. Howey, Co.</u>, 328 U.S. 293, 301 (1946).  The elements of Howey are satisfied here.  The court holds that Mason Hill, through its employees and control persons, offered investment contracts in the form of Reservation and Purchase Agreements.

      1.    <u>Investments of Money</u>

     Investors unquestionably invested money with Mason Hill.  The Reservation Agreements required investors to transfer at least $20,000 to Mason Hill in order to secure the opportunity to purchase a property.  Investors advanced money to Mason Hill to buy properties Mason Hill had found.  In fact, Mason Hill marketing materials and employees actively portrayed Mason Hill as a portfolio-quality investment.  Mason Hill investors ultimately committed their money, a sum of at $20,000 per property, in order to gain the promised 10% to 30% return on their investments.

      2.    <u>Common Enterprise</u>

     The Tenth Circuit holds that a court, when determining whether a common enterprise exists, must examine "economic reality" to determine whether a transaction, in substance, involves an investment.  <u>McGill v. Am. Land & Exploration Co.</u>, 776 F.2d 923, 925 (10th Cir. 1985) (citing <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336 (1967)).  The "determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit."  <u>Campbell v. Castle Stone Homes, Inc.</u>, Case No. 2:09-cv-250-TS, 2011 WL 902637, *4 (D. Utah Mar. 15, 2011).

     Here, the economic realities demonstrate that the common enterprise element is met.  Mason Hill coupled the sale of real estate with Mason Hill's management to generate promised returns.  Mason Hill offered a free year of management services as added value for investors.  Mason Hill, in brief, touted itself as a hassle-free investment.  Its website claimed that it

presented a "turnkey cash flow real estate investment."  Mason Hill told investors they would

receive annual returns of 10% to 30% and represented that investors would see immediate cash

flow of at least $650 per month.  Mason Hill represented to investors that it would generate

profits through Mason Hill's simple, five-step approach to real estate investing.  Mason Hill's

literature was replete with diagrams, charts and step-by-step illustrations presenting Mason Hill

as a passive investment.  Furthermore, Mason Hill commingled investor funds—including

reservation deposits—in common accounts.  Consequently, the common enterprise element of

the Howey test is satisfied.

      3.     Profits Derived Solely From Others' Efforts.

    Howey's third element is established because the profits from the investment were to be

derived solely from the efforts of Mason Hill.  Investors had no role in the selection of the

properties and provided nothing beyond their principal investment.  Mason Hill found the

properties, selected the tenants, sent out monthly checks, and offered (and in the majority of

cases provided) property management services to the investors.  The investors expected to make

a profit on the investment with Mason Hill.

    Mason Hill's business model did not involve the mere purchase of land.  First, the model

was specifically offered as an investment vehicle.  Mason Hill's offering was "being promoted as

a pure investment, as opposed to a residential development which may, incidentally, be also a

good investment."  Davis v. Rio Rancho Estates, Inc., 401 F. Supp. 1045, 1049-50 (S.D.N.Y.

1975) (internal citation omitted).  Second, Mason Hill offered an investment vehicle in real

estate, premised upon the purchase of a specified duplex (rehabilitated through the efforts of

Mason Hill), together with a package of services associated with that duplex.  For example,

Mason Hill promised to locate the duplex, promised that the duplex would meet certain pre-defined criteria and that Mason Hill would locate tenants, collect rents and maintain the property. The additional agreements between Mason Hill and the investor constitutes the offering of an investment contract.

Mason Hill does not present evidence that the investors simply purchased a duplex and then went elsewhere for rental or property management services.  The investors whose testimony was offered during the evidentiary hearing all stated that it was the "turnkey" approach to real estate investment that induced them to invest with Mason Hill.  Investors expected Mason Hill's property selection and management efforts to be the source of the profits.  While the rents were the source of the profits expected, those profits were to be earned through the efforts of Mason Hill in tenant selection, rent collection and maintenance, not through the effort of the individual investor.

The case of Continental Marketing Corporation v. SEC, 387 F.2d 466 (10th Cir. 1967), provides support for the SEC's view of the Mason Hill model as an investment contract.  In that case, the defendant argued that its "contracts and services [began and ended] with the sale and delivery of live, specific and identified animals and that purchasers' reliance on the company extend[ed] no further."  Id. at 468.  The defendant did not provide any beaver ranching or support after any sale.  However, "[a]ll purchasers of beaver were encouraged not to take possession of the animals and . . . all who purchased from [the defendant] elected not to take possession of their beavers and each contracted with one of the ranchers as suggested by the [defendant]."  Id. at 469.  The court held in favor of the economic reality and found the sale of beavers to be a "security."  The success of the investment was "inescapably tied to the efforts of the ranchers and

32

the other defendants and not to the efforts of the investors."  Id. at 470.

In this case, Mason Hill provided direct support after the sale and encouraged the investors to use its management services.  Although investors were purportedly free to choose another property management service, most Mason Hill investors, like those in Continental Marketing, chose to use Mason Hill's property management services.  The promise of a "hassle-free" investment provides the third element of Howey and the presence of an investment contract.

**B.    Mr. Brody and Ms. Roser Violated the Antifraud Provisions of the Securities Laws.**

To prove that Mr. Brody and Ms. Roser violated the antifraud provisions of the federal securities laws (Sections 17(a) of the Securities Act and 10(b) of the Exchange Act), the SEC must establish that (1) in connection with the offer and sale of securities; (2) Mr. Brody and Ms. Roser engaged in a scheme to defraud when they made untrue statements, omitted material facts, and engaged in transactions, practices or courses of business that operated as a fraud or deceit upon the investor; (3) Mr. Brody's and Ms. Roser's misrepresentations or omissions were material, such that a reasonable investor would consider the misrepresented or omitted facts to be important in making an investment decision; and (4) Mr. Brody and Ms. Roser acted with the requisite scienter in that they intended to deceive, manipulate or defraud investors, or acted recklessly in doing so.  Aaron v. SEC, 446 U.S. 680, 701 (1980); SEC v. Wolfson, 539 F.3d 1249, 1256 (10th Cir. 2008); Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 595-97 (10th Cir. 1979) (defining scienter as reckless conduct).

1.   <u>Defendants made false statements and omissions in connection with the purchase or sale of securities.</u>

Sections 17(a) of the Securities Act[37] prohibits persons, in the offer or sale of a security, from employing any device, scheme or artifice to defraud; obtaining money or property through materially false or misleading statements or omission of material facts; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit.  <u>United States v. Naftalin</u>, 441 U.S. 768, 772-73 (1979).  Section 10(b) of the Exchange Act and Rule 10b-5 prohibit similar conduct in connection with the purchase or sale of a security.  Section 10(b) was designed to prevent all manner of fraudulent practices.  <u>Chiarella v. United States</u>, 445 U.S. 222, 226 (1980); <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 201 (1976); <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153 (1972); <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 186 (1963).

Defendants' misrepresentations and omissions of fact are numerous and significant.  Defendants' failure to inform investors that investor money would subsidize the Defendants' profligate lifestyle is a material omission of fact.  Indeed, as part of their scheme, Defendants solicited IRA and 401(k) retirement funds from investors – funds which were used to pay Defendants' personal bills and fund their extravagant expenditures.

Defendants' representations that investor reservation deposits were held safely in escrow was a material misrepresentation of fact.  Defendants transferred investor funds from the escrow accounts, commingling the money with Mason Hill's general operating accounts.  Unbeknownst to investors, Defendants used these funds to pay Mason Hill's operating expenses, sales

---

[37]15 U.S.C. § 77q(a).

commissions and Mr. Brody's and Ms. Roser's personal expenses.  Defendants also used new investor funds to purchase properties for some earlier investors and to make the promised profit payments to earlier investors – a classic Ponzi scheme.

Defendants' marketing strategy was misleading.  Misrepresentations were made to investors regarding high monthly returns through a "turnkey" approach to real estate investing.  Defendants promised investors "turnkey" ready properties, refurbished to "near-new" condition.  That was false.  Many of the properties purchased by Mason Hill were not rehabilitated, but were in various states of disrepair and often unsuitable for tenancy.  Nevertheless, Defendants and their employees or strategic partners promised investor returns, varying from 10% to 30%, with monthly net rental profits of at least $650 to $1000.

The property selection process, the pretext that Mason Hill maintained on-site property management and even claims of an inventory of property purchased in bulk to provide investors discounts were all further representations Defendants made in their solicitation of funds.  Defendants provided information sheets and photographs of specific properties purportedly owned by Mason Hill and available for purchase.  Often, Defendants had either not purchased the real estate at all or had purchased a different property using investor funds.

Defendants misrepresented to investors that Mason Hill held an inventory of available properties.  Defendants claimed that Mason Hill had acquired the alleged properties in bulk from banks at prices not available to individual purchasers.  Not only was there no inventory of properties, Mason Hill had never purchased properties in bulk.  In fact, Mason Hill provided no discounts for investors, because it actually purchased properties individually – and at the same price at which the properties could be obtained by an individual investor.  Often, Mason Hill

participated in simultaneous closings in which it would acquire a property and immediately sell it to an investor.  Mason Hill did not disclose this practice to its investors.

The Defendants made several misrepresentations about financing and returns on investments.  Mason Hill represented to investors that it could arrange for mortgage financing in order to assist with the purchase of its available properties.  However, Mason Hill never arranged financing or even provided seller financing.  This is material, because Mason Hill did not inform investors their reservation deposits were non-refundable.

Finally, Mason Hill, at the direction of Mr. Brody and Ms. Roser, also failed to disclose Mr. Brody's earlier securities law violations and criminal conviction for violation of a tax law. In fact, some investors were not aware of Mr. Brody's involvement in the company at all despite the fact that he controlled Mason Hill's operations and was its de facto CEO and decision-maker. Mr. Brody and Ms. Roser seemingly wanted to keep Mr. Brody's involvement in Mason Hill secret to avoid inadvertent disclosure of Mr. Brody's misconduct.

2.      Defendants' Misrepresentations and Omissions Were Material.

Information is material if a substantial likelihood exists that the facts would have assumed actual significance in the investment deliberations of a reasonable investor.  Basic Inc. v. Levinson, 485 U.S. 224, 234-36, 240 (1988).  Misrepresentations regarding the use of investors' funds are material.  See SEC v. Cochran, 214 F.3d 1261, 1268 (10th Cir. 2000) (information implicating the fair market value would be material to a reasonable investor); Everest Sec., Inc. v. SEC, 116 F.3d 1235, 1239 (8th Cir. 1997) (holding that it would be material to an investor to know that the offering company's existing project had been abandoned, that none of its asset value was to be recouped).  Similarly, investors would consider it important to

36

know their funds were being misappropriated and used for purposes other than those stated when solicited.  SEC v. TLV Invs. & Trade Co., 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001).

Here, as described above, the Defendants made misrepresentations and omissions regarding the use of the investors' funds and failed to disclose that such funds were being misappropriated and used for purposes other than those stated when solicited.  There is a substantial likelihood that such information would have assumed actual significance in the investment deliberations of the Defendants' investors.  The Defendants' misrepresentations and omissions were material.

      3.    Defendants Acted With Scienter.

Scienter is an element of violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5, but is not a required element of a violation of Sections 17(a)(2) or 17(a)(3) of the Securities Act.  Aaron v. SEC, 446 U.S. 680, 696-97 (1980).  The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst, 425 U.S. at 193 n.12.  Reckless conduct has been held to satisfy the scienter requirement.  Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 595-97 (10th Cir. 1979).

The Defendants acted with the requisite scienter.  Here, Mr. Brody and Ms. Roser were involved in the operations of the business, with significant decision-making power.  Mr. Brody, among other things, misrepresented to investors the nature of their investment.  Ms. Roser was chiefly responsible for Mason Hill's marketing materials, including developing and maintaining its website, wherein Mason Hill touted itself as a hassle-free approach to real estate investing.  Defendants knowingly misappropriated investors' monies, including funds from IRA and 401(k)

accounts.  Defendants caused or instructed the transfer of investors' funds to VirtualMG, a front

company Ms. Roser owned and controlled, in order to pay for Ms. Roser's and Mr. Brody's

personal expenses.  Company managers confronted both Mr. Brody and Ms. Roser with evidence

of wrongdoing; however, Mr. Brody and Ms. Roser chose to ignore the evidence.  Ultimately,

Defendants knowingly operated a classic Ponzi scheme for their personal benefit.

The court also draws an adverse inference from Mr. Brody's and Ms. Roser's invocation

of their Fifth Amendment privilege.  Both refused to answer any substantive questions about

their dealings with Mason Hill or the handling of investor funds.  The United States Supreme

Court has held that "the Fifth Amendment does not forbid adverse inferences against parties to

civil actions when they refuse to testify in response to probative evidence offered against

them[.]" Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).  "'Failure to contest an assertion . . . is

considered evidence of acquiescence . . . if it would have been natural under the circumstances to

object to the assertion in question.'"  Id. at 319 (quoting United States v. Hale, 422 U.S. 171, 176

(1975)).  Mr. Brody's and Ms. Roser's silence and failure to contest the SEC's assertions is

evidence of their acquiescence to the fact that they were conscious of Mason Hill's fraudulent

activities and their active involvement in the scheme to defraud Mason Hill investors and that

they knowingly and purposely defrauded investors.

4.      Defendants Used the Means and Instrumentalities of Interstate Commerce.

Defendants used the requisite jurisdictional means to effectuate the fraud.  In Pereira v.

United States, 347 U.S. 1, 8-9 (1954), the United States Supreme Court noted that the

"jurisdictional means" element is satisfied if a defendant knows that the use of mail or wire

services was a reasonably foreseeable consequence of a scheme.  "All that is required to establish

a violation of [Section 17(a), Section 10(b) or Rule 10b-5] is a showing that a means,

instrumentality or facility of a kind described in the introductory language of th[e] section was

used, and that in connection with that use an act of a kind described [in the relevant section]

occurred." Matheson v. Armbrust, 284 F.2d 670, 673 (9th Cir. 1960); accord United States v.

Tallant, 547 F.2d 1291, 1297 (5th Cir. 1977).  Here, the Defendants made use of the mails, the

Internet, and the telephone to solicit investments.  Funds were wired to Defendants' bank

accounts and subsequently used to make rental payments to investors.  That is all that is required.

## C.   Mr. Brody and Ms. Roser Violated the Registration Requirements of the Securities Act.

 In order to establish a violation of the registration requirements of the Securities Act

(Sections 5(a) and 5(c)), the SEC must demonstrate that the Defendants, directly or indirectly,

offered or sold securities without a registration statement having been filed or in effect.  See SEC

v. Int'l Chem. Dev. Corp., 469 F.2d 20, 27 (10th Cir. 1972).  "The elements of [an] action for

violation of Section 5 are (1) lack of a registration statement as to the subject securities; (2) the

offer or sale of securities; and (3) the use of interstate transportation or communication and the

mails in connection with the offer or sale." Europe & Overseas Commodity Traders, S.A. v.

Banque Paribas London, 147 F.3d 118, 124 (2d Cir. 1988) (internal citation omitted).

Scienter is not an element of a Section 5 violation.  See, e.g., Aaron, 446 U.S. at 714 n.5.

Rather, section 5 imposes strict liability on anyone who directly or indirectly violates its plain

terms.  See SEC v. Friendly Power Co. LLC, 49 F. Supp. 2d 1363, 1367-68 (S.D. Fla. 1999);

SEC v. DCI Telecommunications, Inc., 122 F. Supp. 2d 495, 501 (S.D.N.Y. 2000); SEC v.

Current Fin. Servs., Inc., 100 F. Supp. 2d 1, 5 (D.D.C. 2000).

The first element of a Section 5 violation is that the defendants lacked a valid registration statement for the security at issue.  See Int'l Chem., 469 F.2d at 27.  Here, Mr. Brody and Ms. Roser sold securities in the form of investment contracts.  But Mason Hill never filed a registration statement with the SEC for those securities.

The second and third elements of a Section 5 violation are also easily proved.  The second element requires that the Defendants lacked a registration statement when they offered or sold the securities.  See Europe & Overseas Commodity Traders, 147 F.3d at 124.  Mr. Brody and Ms. Roser sold Mason Hill securities in the form of investment contracts but failed to file a registration statement as to those securities.  Accordingly, the second element is satisfied.  The third element requires the use of interstate communications.  Id.  That element has also been proven, as discussed above.

In short, Mr. Brody and Ms. Roser violated Section 5 of the Securities Act when they failed to file a registration statement for Mason Hill securities.

**D.      Mr. Brody and Ms. Roser Violated Section 15(a) of the Exchange Act.**

Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from making use of the mails or any means or instrumentality of interstate commerce to effect or attempt to induce transactions in securities unless registered with the SEC in accordance with Section 15(b).  15 U.S.C. § 78o(a)(1).  Section 3(a)(4) of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities fo the account of others."  15 U.S.C. § 78c(a)(4).  The phrase "engaged in business" connotes regular participation in securities transactions.  Among the activities that indicate that a person may be a broker are solicitation of investors to purchase securities, involvement in negotiations between the issuer and the investor,

and receipt of transaction-related compensation.  See, e.g., SEC v. Hansen, No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984).  Actions indicating that a person is "effecting" securities transactions include soliciting investors, handling customer funds and securities, participating in the order-taking or order-routing process, and extending or arranging for the extension of credit in connection with a securities transaction.  See, e.g., Massachusetts Fin. Servs., Inc. v. Sec. Investor Prot. Corp., 411 F. Supp. 411, 415 (D. Mass. 1976), aff'd, 545 F.2d 754 (1st Cir. 1976); Hansen, 1984 WL 2412, at *10; SEC v. Nat'l Exec. Planners, Ltd., 503 F. Supp. 1066, 1073 (M.D.N.C. 1980); SEC v. Century Inv. Transfer Corp., Fed. Sec. L. Rep. (CCH) ¶ 93,232 (S.D.N.Y. Oct. 5, 1971).  Scienter is not required in order to prove a violation of Section 15(a).  See Merrill Scott, 505 F. Supp. 2d at 1216 (citing SEC v. Martino, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003)); see also SEC v. Interlink Data Network of Los Angeles, Inc., No. 93-3073 R, 1993 WL 603274 (C.D. Cal. Nov. 15, 1993), rev'd on other grounds, 77 F.3d 1201 (9th Cir. 1996.  Accordingly, the SEC need only establish that Mr. Brody and Ms. Roser acted as broker-dealers in offering and selling Mason Hill securities and that they failed to register with the SEC under Section 15(b), 15 U.S.C. § 78o(b).

The evidence demonstrates that Mr. Brody and Ms. Roser acted as unregistered broker-dealers when they offered and sold securities without registering with the SEC.  First, Mr. Brody and Ms. Roser acted as broker-dealers when they solicited investors to purchase securities in the form of investment contracts.  They did this through Mason Hill's employees, strategic partners, website, webinars and other communications with investors, including Mr. Brody's and Ms. Roser's personal interactions with investors.  Mr. Brody and Ms. Roser never registered Mason Hill's securities with the SEC, and, consequently, they violated Section 15(a)(1) of the

Exchange Act.

**E.**   **Remedies**

"Once a violation of the federal securities laws has been found, a district court 'has broad equitable power to fashion appropriate remedies.'" <u>Milan Capital</u>, 2000 WL 1682761, at *9 (quoting <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996)). The SEC seeks an order permanently enjoining Mr. Brody and Ms. Roser from future violations of the federal securities laws, disgorgement together with prejudgment interest, and a civil monetary penalty.

   1.   <u>Permanent Injunction</u>

The Securities Act and the Exchange Act give the court authority to grant injunctive relief where it appears that a person is engaged in or about to engage in violations of the federal securities laws.  15 U.S.C. §§ 77t(b), 78u(d).  When a federal agency charged by statute with safeguarding the public interest brings an action for injunctive relief, irreparable injury may be presumed.  <u>See, e.g.</u>, <u>United States v. Odessa Union Warehouse Co-Op</u>, 833 F.2d 172, 174-75 (9th Cir. 1987).  In order to obtain a permanent injunction, the SEC must prove (1) a prima facie case of previous violations; and (2) a reasonable likelihood that the wrong will be repeated.  <u>See, e.g.</u>, <u>SEC v. Pros Int'l, Inc.</u>, 994 F.2d 767, 769 (10th Cir. 1993); <u>SEC v. Unifund SAL</u>, 910 F.2d 1028, 1036-37 (2d Cir. 1990); <u>SEC v. Mgmt. Dynamics, Inc.</u>, 515 F.2d 801, 807 (2d Cir. 1975).

      a.   *Previous Violations*

The SEC has already established a prima facie case of previous violations, as set forth above.  Accordingly, the court need only address whether there is a reasonable likelihood that the wrong will be repeated.

b.    *Likelihood of Future Violations*

There is a substantial likelihood that the Defendants will persist in their illegal conduct

unless enjoined.

In determining the likelihood of future violations, the court looks at several factors,

including the degree of scienter, the egregiousness of the violation, whether the defendant's

occupation will present opportunities for future violations, and, whether the defendant has

acknowledged wrongdoing and made sincere assurances against future violations.  SEC v. Pros

Int'l, Inc., 994 F.2d 767, 769 (10th Cir. 1993).  The court must consider the totality of the

circumstances.  SEC v. Suter, 732 F.2d 1294, 1301 (7th Cir. 1984).

Here, Mr. Brody is a recidivist, and Ms. Roser has demonstrated not only a willingness to

follow in Mr. Brody's footsteps but also a willful defiance of her obligations under the law and

court orders.  The two will continue to violate the federal securities laws if not enjoined.

Mr. Brody has violated the securities laws before.  (See SEC v. Merrill Scott, Case No.

2:02-CV-39-TC (D. Utah).)  Past conduct amounting to "systematic wrongdoing rather than

isolated occurrence" may be "particularly appropriate" for a permanent injunction.  Milan

Capital, 2000 WL 1682761, at *9 (citing First Jersey, 101 F.3d at 1477 (internal citations

omitted)).  There is no assurance that Mr. Brody will not revert to defrauding investors.

In fact, the evidence of his activities following the court's issuance of a TRO in this case

shows just the opposite.  Mr. Brody and Ms. Roser have created elaborate investment schemes

and aggressively solicited investors.  Defendants have hidden or sold assets belonging to the

Receivership Estate. Defendants have neither accepted their wrongdoing nor provided any

guarantee that they will not commit future violations.  Defendants neither recognize the

wrongfulness of their actions nor the need to redress those harmed.

The degree of scienter "bears heavily" on the decision. <u>Pros Int'l.</u>, 994 F.2d at 769 (citing <u>SEC v. Haswell</u>, 654 F.2d 698, 699 (10th Cir. 1981)). As explained above, Defendants knew (based on the facts and the adverse inference drawn from the Defendants' exercise of their Fifth Amendment privilege) that their conduct defrauded numerous investors. Both Mr. Brody and Ms. Roser were told by their employees that their businesses bore the hallmarks of fraud.

All of the <u>Pros</u> factors, including a high degree of scienter, are present here. Accordingly, the court holds that the SEC has established the likelihood of future violations.

In addition, Mr. Brody and Ms. Roser attempted to form a new company in Ireland called Jensen Blair. Both asserted their Fifth Amendment privilege against self-incrimination when asked about Jensen Blair during their depositions. While the court found that this conduct did not rise to a violation of the TRO, Mr. Brody's and Ms. Roser's abortive Jensen Blair conduct[38] is evidence of their predilection to violate the federal securities laws in the future.

The court must also consider "the likelihood that [] [defendants'] customary business activities might again involve [] [them] in such transactions." <u>Suter</u>, 732 F.2d at 1301. It appears that Mr. Brody and Ms. Roser have no occupation beyond soliciting investments.

Combined with Brody's misdemeanor tax conviction, the action currently pending against the Defendants, and their endeavor in Ireland, the facts demonstrate that Mr. Brody and Ms. Roser are highly likely to continue to invent new fraudulent schemes to defraud investors. Consequently, given their conduct, the high degree of scienter demonstrated, and the high

---

[38]<u>See</u> "Continuation of Similar Enterprise" section in Factual Background, <u>supra</u>.

likelihood that Brody and Roser will likely engage in violations of the securities laws, this court

permanently enjoins Mr. Brody and Ms. Roser from violating Section 17(a) of the Securities Act,

15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5; Sections 5(a) and (c) of the Securities Act, 15 U.S.C.

§ 77e(a), (c); and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

      2.    <u>Disgorgement and Pre-Judgment Interest</u>

     Courts may order disgorgement of ill-gotten gains in SEC-instigated injunctive actions.

<u>Merrill Scott</u>, 505 F. Supp. 2d at 1216 (referencing <u>First Jersey</u>, 101 F.3d at 1474).  Actions for

disgorgement of improper profits are equitable in nature, because the purpose of disgorgement is

to prevent unjust enrichment.  <u>Id.</u>  By taking away the ill-gotten gains of violators, disgorgement

serves the deterrence objective of the securities laws.  <u>First Jersey</u>, 101 F.3d at 1475.  The

amount of disgorgement should include all gains flowing from illegal activities and "need only

be a reasonable approximation of profits causally connected to the violation." <u>Id.</u> (quoting <u>SEC v.

Patel</u>, 61 F.3d 137, 139 (2d Cir. 1995)); <u>SEC v. First Pac. Bancorp</u>, 142 F.3d 1186, 1192 n.6 (9th

Cir. 1998).

     The amount of disgorgement should not include any offset for the operating expenses of

Mason Hill.  <u>SEC v. JT Wallenbrock & Assocs.</u>, 440 F.3d 1109, 1115 (9th Cir. 2006)

(concluding "it would be unjust to permit the defendants to offset against the investor dollars

they received the expenses of running the very business they created to defraud those investors

into giving the defendants the money in the first place"). "Neither the deterrent purpose of

disgorgement nor the goal of depriving a wrongdoer of unjust enrichment would be served were

we to allow these defendants – who defrauded investors … to 'escape disgorgement by asserting

that expenses associated with this fraud were legitimate.'" Id. (quoting SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 16 (D.D.C. 1998)).

Mr. Brody and Ms. Roser misappropriated at least $1,367,250 from investors.  The SEC is entitled to an order requiring Mr. Brody and Ms. Roser, jointly and severally, to disgorge their ill-gotten gains in the amount of $1,367,250 together with prejudgment interest.  "Generally, prejudgment interest at the IRS underpayment rate is appropriate because '[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." Milan Capital, 2000 WL 1682761, at *10 (citing First Jersey, 101 F.3d at 1476).  Using the amount of $1,367,250, the SEC calculates prejudgment interest to be $142,063.  The total sum of disgorgement is $1,509,313.

    3.    Civil Monetary Penalty

The SEC seeks civil penalties for violations of the federal securities laws against Mr. Brody and Ms. Roser under Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act.  See 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3).  Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar misconduct in the future. Accordingly, the factors considered to determine the likelihood of future violations for the purposes of a permanent injunction are also useful in assessing civil penalties.  SEC v. Brethen, No. C-3-90-071, 1992 WL 420867, at *23 (S.D. Ohio Oct. 15, 1992). When determining the appropriate civil penalty to impose, the Brethen court recognized and examined three salient factors identified originally in SEC v. Youmans: (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; and, (3) the degree of scienter involved. Id.

(recognizing <u>Youmans</u>, 729 F.2d 413, 415 (6th Cir. 1984)).

The SEC seeks a third-tier penalty.  A third-tier penalty is appropriate where the violations (1) involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(c); 78u(d)(3)(b)(iii).

When determining whether to assess civil penalties, a court may consider evidence of a defendant's overall conduct, including conduct that is not directly related to the violations at issue.  For example, in <u>SEC v. Moran</u>, the court considered the defendant's refusal to recognize the seriousness of his violations in deciding to impose civil penalties under the remedies act.  944 F. Supp. 286, 296 (S.D.N.Y. 1996).

The facts show that Mr. Brody and Ms. Roser repeatedly induced investors to participate in their systematic program of deception and fraud.  Although they knew they were misappropriating investor money, they continued to solicit new investors and take their money. Mr. Brody's and Ms. Roser's high level of scienter is further evidenced by the expansive nature of the Mason Hill scheme and by the number of investors involved.  Mr. Brody and Ms. Roser targeted investors from all over the country, giving no consideration to their level of sophistication.  They further provided some investors with monthly payment and cash-flow reports which did not accurately represent how the money was being used or how profitable a property was.

Even the filing of the SEC's enforcement action has not stopped Mr. Brody and Ms. Roser from engaging in conduct that violates the federal securities laws.  For instance, Mr. Brody

and Ms. Roser, absent court instruction or order, did not cooperate with either the SEC or the court-appointed Receive during discovery.  Indeed, the court found them in contempt for violating the Asset Freeze Order by hiding or disposing of assets subject to the order.  And Mr. Brody is a recidivist. While undeterred by prior injunctions or penalties, he should not escape the consequences of his fraudulent conduct in this case.

For the reasons set forth above, the court grants the SEC's request for third-tier civil penalties against each Mr. Brody and Ms. Roser in addition to a permanent injunction and disgorgement of misappropriated investor funds.

For violations occurring after March 3, 2009, third tier civil penalties may be imposed at a rate of up to $150,000 per violation for each natural person. See 17 C.F.R. § 201.1004. Imposition of these penalties requires proof of "substantial losses or risk of losses to others." Id. Investors lost approximately $1,367,250.  SEC seeks a civil penalty of up to $150,000 against each Mr. Brody and Ms. Roser, then multiplied by the number of investors, estimated to be 75, for a total maximum penalty of $11,250,000.

The court may set the penalty at any amount it deems appropriate under the circumstances, taking into account the public interest factors identified in Section 21(d)(2) of the Securities Act and 21(d)(3) of the Exchange Act.  Those public interest factors are: (1) whether the act or omission involved fraud or deceit; (2) the harm to others resulting either directly or indirectly from such act or omission; (3) the extent to which any person was unjustly enriched; (4) whether such person has previously been found to have violated the securities laws; (5) the need to deter such person and other persons from committing such acts or omissions; and, (6) such other matters as justice may require.

48

Although the court holds that civil penalties are appropriate here, the court does not accept the SEC's suggested penalty of $11,250,000.  Rather, the court defers ruling on the amount of penalties until the parties have submitted briefs addressing the amount of civil penalties to impose.  A briefing schedule is listed below.

## **ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.      The SEC's Motion to Strike Affidavit of Laura Roser (Docket No. 253, 259), the SEC's Motion to Strike Affidavit of Patrick M. Brody (Docket No. 255, 261), and the SEC's Motion to Strike Affidavit of David Helm (Docket No. 257, 263) are GRANTED.  Accordingly, the Affidavit of Laura Roser (Docket Nos. 235, 241), the Affidavit of Patrick Brody (Docket Nos. 236, 242), and the Affidavit of David Helm (Docket Nos. 237, 243) are STRICKEN from the record.

2.      SEC's Motion for Summary Judgment (Docket No. 195) is GRANTED and the Defendants' Cross Motion for Summary Judgment (Docket No. 234) is DENIED.

3.      It is hereby ORDERED that Mr. Brody and Ms. Roser are permanently enjoined from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240-10b-5; Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § § 77e(a), (c); and Sections 15(a) and 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§  78o(a)-(b).

4.      It is further ORDERED that Mr. Brody and Ms. Roser are jointly and severally liable for, and shall pay, $1,509,313.00 as disgorgement fees and prejudgment interest.

5.      The court finds that a civil penalty in an amount to be determined after further

briefing will be imposed on both Mr. Brody and Ms. Roser.  The SEC is directed to file a brief

with the court on the issue of the civil penalty amount.  Such brief shall be submitted no later

than three weeks from the date of this order.  Defendants may file a response no later than two

weeks after the date the SEC files its brief.  SEC may file a reply brief no later than 1 week after

the Defendants file their response.  If the court believes that a hearing is necessary, it will notify

the parties.

SO ORDERED this 6th day of March, 2013.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge